525 A.2d 643

**Stanley R. WEIMER**

v.

**Jody Ann HETRICK et al.**

**No. 99, Sept. Term, 1986.**

Court of Appeals of Maryland.

May 28, 1987.

David R. Thompson (Roy B. Cowdrey, Jr. and Franch, Earnest & Cowdrey, P.A., on the brief), Easton, for appellant.

John F. King, Jeanette A. Plante, and Anderson, Coe & King, Baltimore, on brief, for amicus curiae the Medical and Chirurgical Faculty of State of Maryland.

E. Fremont Magee, H. Mark Stichel and Piper & Marbury, Baltimore, on brief, for amicus curiae Chesapeake Physicians, P.A.

Donald L. DeVries, Jr., J. Mitchell Lambros and Semmes, Bowen & Semmes, Baltimore, on brief for amicus curiae Franklin Square Hospital, Greater Baltimore Medical Center, Inc., South Baltimore General Hospital, Dorchester General Hospital, University of Maryland Medical Systems Corp., Maryland Society for Healthcare Risk Management and R.I.S.C., Inc.

Henry E. Dugan, Jr. (Gilbert H. Robinette and Robinette, Dugan, Seiden & Jakubowski, P.A., on the brief), Baltimore, for appellees.

Argued before COLE, RODOWSKY, COUCH and McAULIFFE, JJ., MARVIN H. SMITH and CHARLES E. ORTH, Jr., Associate Judges of the Court of Appeals of Maryland (retired), Specially Assigned and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

W. ALBERT MENCHINE, Judge, Specially Assigned.

Appellees, Jody Ann Hetrick and Michael Cary Hetrick, filed a malpractice claim, pursuant to the Health Care Malpractice Claims Act (Courts and Judicial Proceedings Article, Subtitle 2A, 1984 Repl.Vol.) with the Health Claims Arbitration Office, in August 1982, alleging that Appellant, Dr. Stanley R. Weimer; Dr. Thomas R. Moeser; Dr. John S. Harris;[1] St. Agnes Hospital;[2] and the Anne Arundel Hospital were negligent in the care and treatment of Jason

---

1. Drs. Moeser and Harris were obstetricians attending the mother during pregnancy. The settled claims against them contended that they had misdiagnosed as cholecystitis the life-threatening condition known as eclampsia.

   Eclampsia is a condition of uncertain etiology, occurring during some pregnancies, that compromises the placenta, through which the blood of the mother passes to and through the body of the fetus and returns through it to the blood stream of the mother for purification. The condition is life-threatening to mother and child.

2. St. Agnes Hospital was not joined as a party defendant in the circuit court.

Michael Hetrick, their son, who was delivered by caesarean section but who died hours after birth.

The Health Claims Arbitration panel found no liability on the part of the Health Care Providers against whom the claim was litigated, but found liability on the part of Dr. Moeser, although he had settled the claim against him prior to hearing. Appellees rejected the panel decision pursuant to the judicial review provisions of the Act (Cts. & Jud.Proc. Art. § 3–2A–06) and filed suit in the Circuit Court for Anne Arundel County against Dr. Weimer, Dr. Harris and Anne Arundel General Hospital. Dr. Harris settled with Appellees prior to trial in the Circuit Court for Anne Arundel County. Motion for directed verdict as to Anne Arundel General Hospital was granted at the end of evidence offered by the plaintiffs. The case then proceeded against Dr. Weimer alone, going to the jury under Counts I and III.

The mother had been admitted to Anne Arundel County Hospital on the service of Dr. Thomas Moeser on September 2, 1978 with a diagnosis of "severe gastroenteritis versus cholecystitus." Her condition worsened and on September 9, 1978 she underwent exploratory laparotomy. It was noted that the gall bladder was completely normal but she had a great deal of edema of the liver and it was felt that she was a very early severe pre-eclamptic. The incision was closed without cholecystectomy being done. A very stormy course followed the exploratory operation. Within twelve hours, it was felt that the severe pre-eclampsia could not be controlled and that termination of the pregnancy was necessary. The mother agreed to delivery by caesarian section, knowing that the 32–week gestation infant might have only a poor chance of survival. A 3 lb., 6 oz. boy was delivered by the operative procedure performed by Drs. Moeser and Harris. Dr. Weimer occupied no role in either operative procedure but received the infant in the operating room after the delivery at 6:43 p.m.

Dr. Kenneth L. Harkavy, a physician and neonatologist, testified that Dr. Weimer's medical services for the infant were not in keeping with the required standard of care: (1) inadequate resuscitative efforts; (2) improper use and dos-

age of bicarbonate; (3) premature removal of the umbilical venous line that was the only route for administration of medicines and nourishment—removal should not have occurred prior to starting an I.V.; (4) flushing the umbilical venous line with an excessive concentration of Heparen; (5) failure to observe the baby's progressive fatigue from his trying to keep his lungs expanded; (6) failure to monitor blood sugar of the infant. Dr. Harkavy conceded that many of the symptoms shown by history in the hospital record on original admission were classic findings for eclampsia. He concluded, however,

"Given the condition of the baby at birth, are you able to say with reasonable medical probability whether this baby would have survived if the resuscitation had not been inadequate?"

Answer: "I can tell you that at the birth weight and with an Apgar of two that that baby's survival chances would still be considered good. In fact, the likelihood of survival still that we're talking about is 80 to 90%. Perhaps somewhat pre—slightly prejudiced from the average survival rate but not significant."

The conclusion expressed after autopsy was as follows:

"The cause of intrauterine anoxia in this case is uncertain when the clinical events are examined. Some authors have indicated that during eclampsia, blood flow to the placenta is decreased which would, of course, lead to a decreased oxygen supply to the fetus. Over a long period of time, toxemia may lead to growth retardation and decreased fetal size. Another possibility in this case is that anoxia to the fetus occurred at the time of surgery from anesthesia administration. Of course, the mother underwent both cholecystectomy and caesarean section presenting two periods during which intrauterine anoxia might have occurred. There is no history supportive for the other main causes of fetal anoxia as abruptio placenta, placenta previa, maternal shock, placental infarct, or cord interruption. Thus, it would seem most probable that a combination of eclampsia plus general anesthesia led to fetal anoxia and the pathologic changes observed.

Although fetal mortality in the presence of eclampsia has greatly improved, it still remains a substantial cause of fetal death. This is frequently secondary to the necessity of premature delivery in these mothers."

Dr. Judith Gieske, a pediatrician, after tracing the course of the baby's life from delivery to death, concluded that Dr. Weimer met the standard expected of him and did nothing that caused or contributed to the baby's death.

In Count I, Jody Ann Hetrick had sued as personal representative of the estate of Jason Michael Hetrick, deceased, pursuant to the provisions of Annotated Code of Maryland, Courts and Judicial Proceedings Article, Subtitle 4 *Practice, in General,* § 6–401(a) Survival of Actions [3] (1984 Repl.Vol.) and Estates and Trusts Article, Subtitle 4 *Powers of Personal Representative* § 7–401(x) *General Powers* (1974).[4]

In Count III, Jody Ann Hetrick and Michael Cary Hetrick, mother and father, respectively, of Jason Michael Hetrick, deceased, had sued pursuant to the provisions of Courts and Judicial Proceedings Article, Subtitle 9 *Wrongful death* § 3–902(a) and § 3–904.[5] The jury returned verdicts in favor of the defendant, Dr. Weimer, under both counts.

The Appellees appealed to the Court of Special Appeals. That court, not distinguishing between the respective rights

---

**3.** Cts. & Jud.Proc.Code Ann., § 6–401, *Survival of actions,* in part here pertinent, reads as follows: "(a) *At law*—A cause of action at law, whether real, personal, or mixed, except slander, survives the death of either party."

**4.** Est. & Trusts Code Ann., § 7–401, *General Powers,* in part here pertinent, reads: "(x) *Prosecute or defend litigation.*—He may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted...."

**5.** Section 3–902(a) *Liability notwithstanding death* reads as follows: "(a) *Action against person causing death of another.*—An action may be maintained against a person whose wrongful act caused the death of another."

Section 3–904(a) *Action for wrongful death* reads as follows: "(a) *Primary Beneficiaries.*—An action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person."

of the litigants under Count I and under Count III, affirmed in part and reversed in part. (*Hetrick v. Weimer*, 67 Md.App. 522, 508 A.2d 522 (1986)), holding that the trial court erred in instructing the jury that the plaintiff was required to prove by a preponderance of the evidence that death of the decedent was caused by the negligence of the defendant. The court remanded the case for a new trial. In the decision below, the court said:

"Thus, the instruction that the plaintiffs had to prove, by a preponderance of the evidence, that the physician's negligence was the primary or most probable cause of the patient's death imposed an improper burden upon them. The theory of appellants' case was not that Dr. Weimer caused their son's death; it was that Dr. Weimer's failure to do what was reasonable, proper, necessary and appropriate to resuscitate Jason deprived the child of a substantial possibility of survival" (footnote omitted).

67 Md.App. at 541, 508 A.2d at 531.

The trial court's charge on negligence and causation was as follows:

"To hold Dr. Weimer liable, the plaintiffs have to show that his conduct was clearly not recognizable as medically acceptable. And no pediatrician is chargeable with the results of his efforts if he has applied the degree of skill ordinarily required to be expected of a pediatrician in the performance of the services required. And you have to keep in mind the circumstances as they existed at the time of the treatment and the nature and complexity of the medical problems facing the pediatrician at that time. If you find that Dr. Weimer, under those circumstances as they then existed rather than by hindsight, exercised that reasonable degree of care and skill, then you must find in favor of the doctor.

Now plaintiffs need only prove the most likely cause of the baby's death in addition to everything else that I've said. The plaintiffs are not required to negate or exclude every other possible cause. However, if there are two or more causes, either of which could have resulted in the baby's death, one of which for which the pediatrician is

responsible, and the others for which he is not, then the plaintiffs have to prove by evidence more likely so than not that the acts for which the pediatrician is responsible in fact caused the baby's death. Now there I've used that phrase by evidence more likely so than not.

Take the example in this case, and it is strictly an example, and I don't mean to infer that these are the facts. Again, I'm only doing this to clarify what I've just said. You have to decide what the facts are. But if you should find that Dr. Weimer was responsible for the lack of oxygen and that was 50% of the cause of the death and if you feel that the prematurity was 50% of the cause of death, then that's the standoff again. We got two causes of action. There are two possible causes of death that are both equal. If that's the case, the plaintiff hasn't done what the law requires and you must find in favor of the doctor. The plaintiff has to show that the act for which the doctor is responsible for is better than 50%, 51%. That's better."

The exception to that part of the court's charge was as follows:

"Your Honor, in the instructions you failed to give the, or at least I didn't hear it, the instruction on *Thomas v. Corso* to the effect that all that the plaintiff need prove is that the actions of Dr. Weimer took away a substantial possibility that this baby would have survived with appropriate resuscitation. And, thirdly, Your Honor, I object to giving the instruction that Mr. Cowdrey asked for that said that and with your example where you said 50% prematurity, 50% lack of appropriate resuscitation, I don't think that that is the burden that's upon the plaintiff. I think all that the burden—all that the plaintiff need prove is that failure to properly resuscitate took away a substantial possibility that this child would have survived. So in this specific case, as in *Thomas v. Corso*, even though we have offered evidence as to probability, we need only prove substantial possibility which was less than 50%. Thank you, Your Honor."

The intermediate court had grounded its holding upon language used by the late Judge Sobeloff in *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir.1966) that had been quoted by Judge Barnes in our decision in *Thomas v. Corso*, 265 Md. 84, 102, 288 A.2d 379, 389–90 (1972).

"When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly."

We granted certiorari to consider the question of public importance.

I

*The Appeal as it Relates to Count I*
(Survivorship action by the personal representative
under Cts. & Jud.Proc.Art. § 6–401 and
Est. & Trusts Art. § 7–401(x))

No contention was made in the circuit court that recovery of damages for the loss of a substantial chance of survival was permissible under that count of the declaration. The record shows that while the taking of testimony in the circuit court was suspended awaiting arrival of a witness, the trial judge and plaintiffs' counsel discussed the court's instructions to be given in the survivorship action. The following colloquy appears in the record:

"COURT: What damage do you have for the Estate?

MS. JAKUBOWSKI: Pain—

MR. DUGAN: Pain and suffering—

MS. JAKUBOWSKI: Pain and suffering of the baby.

COURT: Oh, as to the individual but as to other than the child itself, there's no evidence of any medical expenses—

MR. DUGAN: Right. I didn't put any bills in or any of that.

MS. JAKUBOWSKI: Right.

COURT: All right, so there's no misunderstanding as to that.

MR. DUGAN: It's just pain and suffering.

COURT: As to the child.

MR. DUGAN: As to the child."

Pursuant to that discussion, the court in its charge to the jury, said:

"One [verdict] is for the Estate. Now that is Mrs. Hetrick, the mother, but she's not here as the mother in this first claim. She's here as representative of the Estate. In other words, she's standing in the baby's shoes, so to speak. It could be anyone. The personal representative is what she's commonly referred to. She happens to be the mother. But this first dollar award is to compensate for the conscious pain and suffering of the baby. Just like anyone that may have been injured in an automobile accident. We happen to be dealing with a death here so, obviously, we don't have the party in front of us. That is where the personal representative, which happens to be Mrs. Hetrick, comes in. So we're talking about the conscious pain and suffering of the baby. Not the mother. Not the father. Only the baby and for whatever period of time it may have survived."

■ No exception was taken to the charge as given by the court under Count I. Accordingly, the question whether Maryland recognizes the loss of a substantial chance of survival as a measure of damages or as a separate tort was not raised or decided under this count of the declaration.

We shall not consider the question under that Count.[6] Md. Rule 885.

## II

### *The Appeal as it Relates to Count III*
(Action for wrongful death under Cts. & Jud.Proc.Art. §§ 3–902(a) and 3–904(a))

### (a)

#### *Burden of proof under such actions*

The general rule in negligence cases is thus stated in *Prosser & Keeton on Torts*, § 38, at 239 (5th ed. 1984):

> "The burden of proof of the defendant's negligence is quite uniformly upon the plaintiff, since he is asking the court for relief, and must lose if his case does not outweigh that of the defendant's" (footnote omitted).

In 2 S.M. Speiser, *Recovery for Wrongful Death* § 12.1, at 288 (2d ed. 1975), it is said:

> "The rule that the person who pleads the existence of a fact has the burden of proving such fact is applicable to wrongful death actions, and thus the statutory plaintiff has the same burden of proof that the decedent would have had if he had lived" (footnote omitted).

In F.B. Tiffany, *Death by Wrongful Act* § 189, at 426 (2d ed. 1913), the author also makes clear that this rule of law has application to cases involving negligence causing death:

> "As in other actions, the burden of proof is upon the plaintiff to establish his case, including the fact that the death was caused by the wrongful act or neglect of the defendant, by a preponderance of evidence" (footnote omitted).

---

**6.** Plaintiffs' decision not to seek recovery for loss of a substantial possibility of survival under Count I may have been produced by our decision in *Rhone v. Fisher*, 224 Md. 223, 167 A.2d 773 (1961). In any case, no such issue was raised below under that count in the circuit court.

In 30 Am.Jur.2d Evidence § 1121, at 288–89, the rule is thus stated:

"The evidence must not leave the causal connection a matter of conjecture; it must be something more than consistent with plaintiff's theory as to how the accident occurred. Where the proof of causal connection is equally balanced, or the facts are as consistent with one theory as with another, plaintiff has not met the burden which the law casts upon him. If the evidence shows that an injury may have resulted from one of several causes, but only one of the causes can be attributed to the defendant's negligence, the plaintiff must fail" (footnotes omitted).

That Maryland courts long have recognized and applied this rule of law is beyond cavil. In *Brady v. Consol Gas Co.*, 85 Md. 637, 641, 37 A. 263 (1897), it was said:

"All the cases agree that to constitute a good cause of action, there should be stated and proved a *right* on the part of the plaintiff, and a *duty* on the part of the defendant in respect to that right, and a breach of that duty by the defendant, *whereby* the alleged injury was produced. Between the negligence and the injury there must be the relation of cause and effect. *Maenner v. Carroll*, 46 Md. 212; *W.U. Tel. Co. v. State, use of Nelson*, 82 Md. 310; *Holly v. Boston Gas Light Company*, 8 Gray, 123; *Trainor's case*, 33 Md. 554, 33 A. 763.
    . . . .
Having these well-established legal principles in view, we now proceed to a consideration of the facts in proof, bearing in mind that the *onus* is on the plaintiff to show affirmatively all the elements of the right to recover. It was necessary for the plaintiff in this case to prove (1) the death of Miss Brady; (2), the negligence of the defendant, and (3), that such negligence was the cause of Miss Brady's death" (emphasis in the original).

85 Md. at 641–42, 37 A. at 264.

The applicability of the above Maryland rule to cases of negligence causing death grounded upon medical malprac-

tice is equally well settled. In *State, Use of Janney v. Housekeeper*, 70 Md. 162, 16 A. 382 (1889), we said:

"It was the duty of the professional men to exercise ordinary care and skill, and this being a duty imposed by law, it will be presumed that the operation was carefully and skillfully performed in the absence of proof to the contrary. As all persons are presumed to have duly performed any duty imposed on them, negligence cannot be presumed, but must be affirmatively proved. Best on Presump. 68; *R.R. Co. v. Chappell*, 21 Fla. 175.

This principle is especially applicable in suits against physicians and surgeons for injuries sustained by reason of alleged unskillful and careless treatment. The burden of proof is on the plaintiff to show a want of proper knowledge and skill. *Leighton v. Sargent*, 31 N.H. 119; *Baird v. Morford*, 29 Ia. 531.

The court below committed no error in determining that it was incumbent on the plaintiff to prove affirmatively that the operation was performed without the consent of the patient, and also that her death was caused by unskillful and careless treatment of the physicians. Nor did the court commit any error in granting the defendants' second prayer, which enunciates the proposition that if death was caused by tubercular meningitis or other disease not produced by the operation, the defendants are not liable."

70 Md. at 171, 16 A. at 384.

The continuing applicability of the rule imposing the burden of proof upon the plaintiff in medical malpractice cases, is shown by *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 621–22, 258 A.2d 595, 598–99 (1969).

"The Court in *Housekeeper* also approved the following prayer submitted by the defendant:

'That the degree of care and skill to be exercised by physicians and surgeons in the performance of an operation is *not the highest degree of care and skill known to the profession but that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients; and the burden of*

*proof is on the plaintiffs in this case to establish by preponderating evidence a want of such ordinary care and skill in the performance of the operation* and attendance upon the said Matilda C. Janney' (emphasis supplied)....

See also *State, Use of Solomon v. Fishel,* 228 Md. 189, 203, 179 A.2d 349 (1962); *State, Use of Shockey v. Washington Sanitarium,* 223 Md. 554, 558, 165 A.2d 764 (1960); *Bettigole v. Diener,* 210 Md. 537, 124 A.2d 265 (1956); *State, Use of Kalives v. Baltimore etc. Hospital,* 177 Md. 517, 526, 10 A.2d 612 (1940); *Fink v. Steele,* 166 Md. 354, 171 A. 49 (1934); *Angulo v. Hallar,* 137 Md. 227, 232, 233, 112 A. 179 (1920); *Miller v. Leib,* 109 Md. 414, 426, 72 A. 466 (1909); *Dashiell v. Griffith,* 84 Md. 363, 380–81, 35 A. 1094 (1896). See also *Riley v. U.S.,* 248 F.Supp. 95, 97 (D.Md.1965).

In *Kalives, supra,* this Court stated:

'Before the equitable plaintiffs can recover against any of the defendants, it must be shown by affirmative evidence that they were either unskilled or negligent in their respective capacities, and that such want of skill or care resulted in the death of Mr. Kalives. If either of the above elements is lacking in the proof, then no case for the consideration of the jury has been presented....' "

The rule of law governing the burden of proof in medical malpractice cases was reiterated in *Pierce v. Johns-Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983). In that case, involving survival and wrongful death actions, the late Judge Davidson, speaking for this Court, said:

"In Maryland, recovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain. Such damages cannot be recovered if future consequences are 'mere possibilities.' Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the

evidence is anything less. *Davidson v. Miller*, 276 Md. 54, 62, 344 A.2d 422, 427–28 (1975)."

296 Md. at 666, 464 A.2d at 1026.

We see no deviation from these rules of law in either the *Hicks* or the *Thomas* decisions. The basic issues for decision in both *Hicks* and *Thomas, supra*, were identical and were similarly stated by the distinguished judges who authored the opinions in the respective courts.

In *Hicks, supra*, Judge Sobeloff, after his review of the record below, upon the issue of the negligence of the defendant said:

> "On careful scrutiny, therefore, the government's expert is seen to have demonstrated that the examiner did *not* conform to the required standard of care. Coupled with the explicit testimony of the plaintiff's experts, the government's testimony *leads us inevitably to the conclusion that the doctor was negligent as a matter of law*" (emphasis added).

368 F.2d at 631–32.

On the question whether the evidence at trial established that "[the doctor's] concededly erroneous diagnosis and treatment was the proximate cause of her death," Judge Sobeloff said:

> "The government further contends that even if negligence is established, there was no proof that the erroneous diagnosis and treatment was the proximate cause of the death, asserting that even if surgery had been performed immediately, it is mere speculation to say that it would have been successful. The government's contention, however, is unsupported by the record. *Both of plaintiff's experts testified categorically that if operated on promptly, Mrs. Greitens would have survived, and this is nowhere contradicted by the government expert*" (emphasis added).

368 F.2d at 632.

He added,

"In sum, the dispensary physician's negligence in failing to make a thorough examination and in omitting standard diagnostic tests, led to an erroneous diagnosis. Because of this, he sent the patient home with instructions not to return for eight hours, rather than immediately admitting her to a hospital. *Since the uncontradicted testimony was that with prompt surgery she would have survived, the conclusion follows that the dispensary doctor's negligence nullified whatever chance of recovery she might have had and was the proximate cause of the death*" (emphasis added).

368 F.2d at 633.

Similarly, in *Thomas, supra,* Judge Barnes, after noting that "we must resolve all conflicts in the evidence in favor of the plaintiffs and give them the benefit of all reasonable inferences to be derived from the evidence favorable to them," 265 Md. at 100, 288 A.2d at 389, examined the evidence on the record then before this Court and said:

"From what we have already stated, the jury could have reasonably concluded that under the circumstances of this case that if Dr. Thomas had performed his duty to attend Corso personally shortly after he was telephoned at 11:30 p.m., Dr. Thomas might well have been able to have saved his life and that this negligent conduct was one of the direct and proximate causes of Corso's death, concurrent with the negligence of the nurses."

265 Md. at 103, 288 A.2d at 390.

In short, the Court in *Hicks* found that the record showed that negligence had been proven as a matter of law and that uncontradicted evidence showed that such negligence was the proximate cause of the death; this Court in *Thomas* found that the record showed evidence legally sufficient to establish negligence that was a proximate cause of the death.

The appellees take comfort in our decision in *State v. Fabritz*, 276 Md. 416, 348 A.2d 275 (1975) wherein Chief Judge Murphy spoke for this Court on the principles of

multiple contributing causes in death cases. The reliance would be apt if the appellees had succeeded in obtaining a favorable jury verdict. Under the instructions given by the trial court, such a contention not only was permissible, the argument actually was made by plaintiffs' counsel but was rejected by the jury. Appellees manifestly have misread our decision in *Thomas, supra.* They state in their brief at page 27:

"Obviously, if a judge grants a directed verdict, as occurred in *Thomas v. Corso,* the case does not even get to the jury—so any time the Plaintiff has not produced sufficient evidence (met the burden of proof) as a matter of law, there are no jury instructions.

All that *Thomas v. Corso* said in the plainest (and consequently the most beautiful language possible) was that the judge applied the wrong burden of proof in granting the directed verdict."

Such was not the status of *Thomas v. Corso* at the appeal to this Court. The trial judge in *Thomas* (with one exception not pertinent to that appeal) correctly, we held, *denied* the defendants' motion for a directed verdict. The jury rendered a verdict in favor of the plaintiffs. Our decision in *Thomas v. Corso* required us to determine "whether the trial court erred in declining to grant motions for directed verdicts and for judgments n.o.v. in favor of [the appealing defendants]." *Id.* [265 Md.] at 86, 288 A.2d at 382. We concluded that it did not err.

We decline to accept appellees' suggestion that such careful and analytical jurists as Judges Sobeloff and Barnes intended the quoted language in *Hicks, supra,* to alter, without discussion, the rule of law governing the burden of proof so anciently formed and so uniformly applied in wrongful death cases under the Maryland statute.

Indeed, the circuit court for the Fourth Circuit itself has rejected such interpretation of those words. In *Clark v. United States,* 402 F.2d 950 (4th Cir.1968) that court said: "Certainly *Hicks* laid down no new rule of law with respect

to either negligence or proximate cause...." *Id.* at 953 n. 4. That same court in *Waffen v. U.S. Dept. of Health & Human Services,* 799 F.2d 911, 915 (4th Cir.1986) said:

"The general principles which ordinarily govern in negligence cases also apply to medical malpractice claims under Maryland law. A *prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of. *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4th Cir.1982). As in any other case founded upon negligent conduct, the burden of proof in a medical malpractice claim rests upon the plaintiff. *Shilkret v. Annapolis Emergency Hospital Ass'n,* 276 Md. 187, 349 A.2d 245, 247 (1975); *Paige v. Manuzak,* 57 Md.App. 621, 471 A.2d 758, 766–67 (1984)." [7]

## (b)

### *The Court's Charge on Causation*

We perceive no new ground having been plowed by *Hicks* or *Thomas,* both *supra.* Judge Sobeloff's philosophical paragraph in *Hicks,* quoted *supra* and cited in *Thomas,* created neither a new tort nor an additional basis for determination of damages in an existing tort. Whether it will prove to be an augury of a burgeoning new tort or introduce a new factor for consideration of damages in tort cases producing injury or death are issues for another day

---

7. It is true that the court in *Waffen,* citing the decision below by the Court of Special Appeals (67 Md.App. 522, 508 A.2d 522 (1986)), ordering retrial of the subject case, declared, "[W]e make explicit that under the law of this circuit, and in particular of the State of Maryland, the loss of a substantial chance of survival is a cognizable harm." *Waffen, supra,* 799 F.2d at 917. For reasons to be stated *infra,* we do not reach the question whether the loss of a substantial chance of survival is a cognizable harm in this State. We do say, however, that this Court did not in *Thomas, supra,* give recognition to such a doctrine either as a new tort or as a new element of damages. We have never recognized such a legal principle.

in another cause. We do not reach those issues. This is so because it is crystal clear that determination of such questions is impermissible in an action for wrongful death under the Maryland statute.

■ The Maryland statute is in derogation of the common law and as such, should be strictly construed. *McKeon v. State, Use of Conrad*, 211 Md. 437, 443, 127 A.2d 635, 638 (1956) and cases cited therein. In plain, unambiguous language, the statute provided a cause of action unknown to the common law for the benefit of described beneficiaries "against a person *whose wrongful act caused the death of another*" (emphasis added). In such circumstances, there is no room for judicial interpretation. *Trimper v. Porter-Hayden*, 305 Md. 31, 36, 501 A.2d 446, 449 (1985).

■ The commencement date for the determination of damages allowable to primary beneficiaries under the statute (both pecuniary and for solatium) *is the date of the death of their decedent.* No damages for injuries and losses sustained by their decedent prior to his death are provided for in the statute.

■ The enlargement of the statute requested by the appellees for recognition of a new tort or for consideration of a new measure of damages "cannot be accomplished in the guise of statutory construction." *Trimper v. Porter-Hayden, supra*, 305 Md. at 36, 501 A.2d at 449. The respective charge to the jury in *Thomas, supra*, and in the subject case, while couched in different words, both recognize the legal principle that a plaintiff beneficiary in an action under the wrongful death statute must show by a preponderance of the evidence that the conduct of a defendant was negligent and that such negligence was a proximate cause of the death of the decedent.[8]

---

8. Court's charge in *Thomas v. Corso, supra:*
"[I]f you find by a preponderance of the evidence that the doctor's conduct was a violation of the duty of care owed to the patient, you must determine, again by a preponderance of the evidence, whether

There was no error in the trial court's charge to the jury. The judgment of the Court of Special Appeals is reversed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. APPELLEES TO PAY THE COSTS.

McAULIFFE, Judge, concurring.

I agree that under the particular circumstances of this case the trial judge did not err in refusing to instruct the jury on the theory of loss of a substantial chance of survival. A claim for damages for loss of a substantial possibility of survival is inherently inconsistent with the element of proof of causation of *death* that is required for the successful maintenance of a wrongful death action.[1]

---

this failure to attend personally to the patient has been shown to a reasonable medical probability or certainty to have caused Mr. Corso's death or to have been a substantial factor in bringing about death. In a word, you must decide whether it was more likely so than not so that the attendance of a physician would have led to disclosure of Mr. Corso's condition in a way different from that which appeared to the nurse at the time and *would have led to remedial measures, with reasonable medical certainty, that would have prevented the patient from falling into the condition of shock which was the ultimate cause of death.*" (Records and Briefs to Thomas Corso, No. 201 Sept. Term, 1971, pp. 475–76 (emphasis added). As Judge Barnes pointed out in *Thomas:* "[T]his negligent conduct was one of the direct and proximate causes of Corso's death, concurrent with the negligence of the nurses." 265 Md. at 103, 288 A.2d at 390.

1. This is not to be confused with the question of causation that may arise when two or more tortfeasors combine to produce a condition that more probably than not resulted in death. The negligence of a number of people may combine to produce such a condition, and each will be liable if his or her negligence was a proximate cause of the condition. Here, however, we are concerned with identifying the condition that caused death, and not with the number of people who contributed to the occurrence of that condition. If, for example, the actions of the preceding physicians left the child with less than a fifty percent chance of survival, it could not be said that negligence on the part of the subsequent treating physician was a cause of death. The most that could be said in that situation is that the negligence of the

Additionally, as the majority points out, neither the allegation nor the proof supported a claim for loss of a substantial chance of survival in Count I (the survivorship action).

I write separately because I am concerned that the majority suggests that we have rejected the concept of a claim for loss of a substantial chance of survival when in fact we hold only that the issue is not presented by this case.

I can agree with much of the dictum in the majority opinion—that our earlier cases have not modified the ordinary requirements of burden of proof and causation to accommodate the theory of loss of a substantial chance of survival. As I view it, however, a claim under that theory does not involve the creation of a new tort, but rather involves a redefinition of damages involved in the claim. Traditional principles of law relating to duty, breach, causation, and burden of proof remain the same—what changes is the acceptance of the concept that damages may be recovered for the loss of a chance of survival where that chance is substantial and can be identified and quantified (and thus valued) without resort to conjecture or speculation. I am unwilling to say that neither *Hicks v. United States*, 368 F.2d 626 (4th Cir.1966), nor *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972) suggests a favorable inclination toward a claim for damages resulting from the loss of a substantial chance of survival. Our holding today is simply that these interesting questions must await resolution on another day.

---

subsequent treating physician deprived the patient of a chance of survival, and that claim cannot be made in a wrongful death action.