**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TROY G. THOMAS,
Plaintiff-Appellant,

v.

WASHINGTON INDUSTRIAL MEDICAL
CENTER, INCORPORATED, a/k/a WIMC,
Defendant-Appellee,

and

R. F.DEL ROSARIO, M.D.,
Individually and in his capacity as
employee for WIMC; ROSITA H.
DEE, M.D., P.A.,
Defendants.

No. 98-1652

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-95-416-DKC)

Argued: April 6, 1999

Decided: July 19, 1999

Before WIDENER, MURNAGHAN, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** George Livingston Garrow, Jr., GARROW & EVANS,
L.L.P., Washington, D.C., for Appellant. Alfred Francis Belcoure, II,

MONTEDONICO, HAMILTON & ALTMAN, P.C., Washington, D.C., for Appellee. **ON BRIEF:** Thomas C. Mugavero, MONTE-DONICO, HAMILTON & ALTMAN, P.C., Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Appellant Troy Thomas sued the Washington Industrial Medical Center ("Medical Center") and Drs. Rolando del Rosario and Rosita Dee for allegedly negligent care following a head injury he sustained while working. He argues that Defendants violated the proper standard of care by failing to order certain diagnostic tests earlier. He maintains that, had Defendants ordered the proper tests, his subsequent brain hemorrhage would have been avoided. The district court granted summary judgment in favor of Drs. del Rosario and Dee and, at the close of Plaintiff's case, judgment as a matter of law in favor of the Medical Center. Thomas now appeals the judgments in favor of Dr. del Rosario and the Medical Center. Finding no reversible error, we affirm the district court's decision.

I.

In October 1990, Appellant Troy Thomas was employed as a mail-handler at a post office station in Washington, D.C. His job was to remove sacks of mail from trucks and place them on conveyor belts that then dropped the sacks into cages. During the night shift on October 23, 1990, the gate of one of the cages flew open and hit Thomas on his forehead, where he sustained a small abrasion and contusion. Accompanied by a co-worker, Thomas went to the health unit at the post office where a nurse examined him. The nurse determined that Thomas should go to the Medical Center[1] for further examination and treatment, which he did.

---

[1] Washington Industrial Medical Center, which at the time of trial was known as "Concentra," is a clinic located in Cheverly, Maryland. It pro-

2

Thomas arrived at the Medical Center shortly before 2:30 a.m. on October 23. Carlton Romney was the physician's assistant on duty. Romney asked Thomas a series of questions, including basic inquiries regarding personal identification (e.g. name, address, date of birth) and the nature of the visit. According to Romney, Thomas exhibited no identifiable neurological abnormalities. He followed all instructions during the examination; his speech was clear; and he appeared to be coherent. In addition, the medical records suggest that Thomas indicated that he had not lost consciousness. Romney cleaned Thomas' wound with peroxide and applied bacitracin and a bandage to cover the area.

After his examination and treatment, Romney gave Thomas a typed instruction sheet for Thomas' follow-up care. Romney explained the instructions to Thomas and described warning signs for which Thomas should watch. Romney advised Thomas to return to the Medical Center to be seen by a physician later that same day. Thomas signed documents indicating that he understood everything Romney had told him, and Romney released Thomas to return to work for the rest of his shift. Romney then called the post office health unit and informed the nurse of his diagnosis and instructions for Thomas' follow-up visit.

Thomas returned to work and, upon arrival, went to the health unit. He gave the nurse the documents Romney had given him and told her that he was to return to the Medical Center that day. The nurse completed a medical report that included his diagnosis, work status, and follow-up visit. Thomas then completed his shift but did not return to the Medical Center that day.

Sixteen days later, on November 8, 1990, Thomas returned to the health unit, complaining of a headache and dizziness. When the nurse asked Thomas if he had returned to the Medical Center, he told her that he had not. The nurse took his vital signs and concluded there were no acute symptoms. She gave him some Tylenol, put him on a less strenuous work assignment for the balance of the shift, and told

_____

vides health services to employees for work-related health needs, including the treatment of work-related injuries.

him to return at 7 a.m. for follow-up instructions. Thomas did not return.

Seven days later, on November 15, Thomas again went to the health unit and complained of a headache. The nurse gave him Tylenol and told him to go to the Medical Center that day. Once again, Thomas failed to comply with the instructions.

The next day, Thomas again contacted the nurse at the health unit. The nurse told him that he must go to the Medical Center and obtain a medical certificate confirming that he had been there for treatment. Thomas returned to the Medical Center that day and complained of continued, severe headaches. Dr. del Rosario performed a neurological examination and found no evidence of any abnormalities. Because Thomas was reporting headaches three and one-half weeks after his accident, however, Dr. del Rosario recommended that Thomas see a neurologist. Accordingly, Dr. del Rosario referred Thomas to Dr. Dee.

On November 23, Dr. Dee performed a neurological examination of Thomas, the results of which were within normal limits. Because of Thomas' report of headaches, however, Dr. Dee scheduled a computed tomography (CT) scan and an electroencephalogram (EEG) of Thomas to take place on November 26 and November 27. Thomas failed to keep either appointment.

On November 30, 1990, Thomas was admitted to the emergency room at Prince George's Hospital Center, after exhibiting unusual behavior. The attending physician at the hospital ordered a CT scan. The results of the scan indicated a condition "suggestive of mild hydrocephalus," or pressure due to fluid in the brain. The eventual diagnosis was acute hydrocephalus with intra ventricular hemorrhage (bleeding in the brain). To release the fluid in Thomas' brain, the attending doctor inserted a catheter into the brain. As a result of the procedure, Thomas suffered further bleeding in the brain. The hemorrhage gradually resolved, and the doctor removed the catheter when Thomas became stabilized. Thomas improved slowly and was discharged from the hospital on December 22, 1990.

Thomas has encephalomalacia (a softening) in the right parietal portion of his brain. Since his surgery, Thomas continues to experi-

4

ence intermittent headaches, which his current treating physician has diagnosed as migraines. He has had several neurological and diagnostic examinations which, with the exception of the encephalomalacia, have revealed no abnormalities.

Alleging negligence, Thomas filed suit in October 1993 in federal district court[2] against the Medical Center, Dr. del Rosario, and Dr. Dee. Thomas charged that (1) Carlton Romney, the physician's assistant who treated Thomas on October 23, 1990, breached the relevant standard of care by failing to order pertinent diagnostic tests and/or an x-ray of Thomas' head and failing to provide proper follow-up care; (2) Dr. del Rosario, who treated Thomas on November 16, 1990, also breached the applicable standard of care because he did not order an immediate CT scan, magnetic resonance imaging (MRI), or x-ray but instead referred Thomas to Dr. Dee, a neurologist; and (3) Dr. Dee, who saw Thomas on November 23, 1990, breached the standard because she arranged for a CT scan of Thomas to occur on November 26, 1990, rather than immediately.

Drs. del Rosario and Dee moved for summary judgment. The court granted the motion, determining that no reasonable jury could find that either doctor had committed malpractice in rendering treatment to Thomas. The court's ruling left for trial the allegation that Romney, the physician's assistant employed by the Medical Center, had committed medical malpractice with respect to the treatment he provided Thomas in October 1990.

The case then proceeded to trial. At the close of Thomas' case, the court entered judgment as a matter of law in favor of the Medical Center. The court ruled, in part, that the evidence did not establish that Thomas' current condition, or brain damage, was the proximate result of the Medical Center's treatment of Thomas.

_____

[2] The case was initially filed in the District Court for the District of Columbia, which transferred the case to the District of Maryland on grounds of forum non conveniens. The District Court for the District of Maryland then issued an Order staying the action, in order to allow Thomas to pursue his claim before the Maryland Health Claims Arbitration Office. Due to delay, Appellees elected to waive arbitration and, in February 1997, asked the court to reopen the case.

5

This appeal followed. Appellant charges that the district court erred in granting the Medical Center judgment as a matter of law at the close of Thomas' case and Dr. del Rosario summary judgment prior to trial.**3** Appellant also asserts that the district court abused its discretion by excluding certain testimony. We find Appellant's claims to be without merit and, therefore, affirm the district court's decision.

II.

A. Judgment as a Matter of Law in Favor of the Medical Center

Appellant charges that the district court erred in concluding that, as a matter of law, there could be no finding of negligence with respect to the Medical Center's delivery of care to Thomas. We review the court's grant of the Medical Center's motion for judgment as a matter of law de novo, see Malone v. Microdyne Corp., 26 F.3d 471, 475 (4th Cir. 1994), viewing the evidence in the light most favorable to Thomas. See id. at 472 n.1. "Judgment as a matter of law is proper `when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.'" Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996), cert. denied, 117 S.Ct. 1246 (1997).

Under Maryland law,**4** the general principles which govern negligence cases ordinarily also apply in medical malpractice claims. See Franklin v. Gupta, 567 A.2d 524, 528 (Md. Ct. Spec. App.), cert. denied, 572 A.2d 182 (Md. 1990). A hospital or other health care facility will be held vicariously liable for the negligent acts of its employees, including physicians, nurses, and other medical and non-medical personnel. See id. at 535. In order to state a prima facie claim for medical malpractice, a plaintiff must (1) establish the applicable

_____

**3** Appellant Thomas has not appealed the district court's ruling in favor of Dr. Dee.

**4** The district court, in a diversity action, is bound to apply the substantive law of Maryland. See Hanna v. Plumer, 380 U.S. 460, 471 (1965). While the substantive elements of the medical malpractice claim are defined by Maryland law, whether Thomas presented sufficient evidence to create a jury issue as to those substantive elements "is controlled by federal rules." Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982).

6

standard of care; (2) demonstrate that the health care facility, or its employee, violated the standard; and (3) develop a causal relationship between the violation and the alleged harm. See id. at 528-29; see also Weimer v. Hetrick, 525 A.2d 643, 651 (Md. Ct. Spec. App. 1987). Appellant Thomas urges that he has satisfied all three elements.

First, Thomas' expert witness, Dr. Maxfield, who is a radiologist, testified that "[t]he standard of care for a head injury is to obtain a CT image of the brain and then to have close follow-up of the individual with subsequent CTs and close monitoring of the individual to put them at rest." Dr. Maxfield continued: "For th[e] night [of Thomas' injury], [the standard of care] would have been to request a CT scan of the brain to be performed and to have established a protocol to be followed for the monitoring and future care of the patient."

Second, Thomas maintains that he provided ample evidence to establish that Defendants breached the relevant standard of care. Defendants, Thomas argues, failed to perform any diagnostic studies and failed to provide proper follow-up treatment for a head injury patient, which arguably includes ensuring that the patient, or someone close to the patient, understood the nature and extent of the injury. Dr. Maxfield opined that "the care and treatment rendered to Mr. Thomas [by the Medical Center on the night he sustained his injury] was below the usual and customary standard of care."

Assuming, without deciding, that the expert witness adequately described the standard of care and that Thomas established a breach of that standard, no reasonable juror could conclude from the evidence in record that the breach was the proximate cause of Thomas' encephalomalacia and periodic headaches. First, even if there had been an immediate CT scan performed on Thomas, there is no evidence that the bleeding had started at that point and, therefore, no evidence that the scan would have revealed the presence of any bleeding. Furthermore, even if bleeding had been present, a CT scan performed at the time of the accident may not have detected any abnormalities. Second, the record shows that additional hemorrhaging occurred as a result of Thomas' surgery on November 30; the surgery-related bleeding could have been the cause of Thomas' current condition. Finally, Thomas' own conduct, i.e., his failure to keep follow-up appoint-

7

ments, may have served as a concurrent cause of his injury.[5] See Myers, 560 A.2d at 64 (determining that patient's "failure to return for further treatment as instructed constituted contributory negligence `preventing recovery for injurious consequences from such failure'"); Chudson, 548 A.2d at 182 ("`A patient who, after receiving treatment, fails to return to the physician or surgeon for further treatment, as instructed, is guilty of contributory negligence preventing recovery for injurious consequences from such failure.'"). Thomas was under specific and repeated instructions to return to the Medical Center for further treatment. Assuming the bleeding existed during the initial weeks after the accident, Thomas directly contributed to his injury by precluding diagnosis and treatment at a time when his condition was treatable.

As support for the contention that there may have been some other cause of Thomas' injuries besides the alleged negligence of the Medical Center, we need look no further than Appellant's own witnesses. Dr. Maxfield did not testify that Thomas' current condition was the proximate result of the Medical Center's treatment. Indeed, Dr. Maxfield could not say if Thomas' injury was due to the original head injury or to subsequent developments. Moreover, Dr. Michael Batipps, Thomas' treating neurologist, specifically linked Thomas'

_____

[5] In order for a plaintiff to be found contributorily negligent, he must either (1) intentionally and unreasonably expose himself to danger created by the defendant's negligence, of which danger the plaintiff knows or has reason to know, or (2) act in a way that falls short of the standard to which the reasonable person should conform in order to protect himself from harm. See Myers v. Estate of Alessi , 560 A.2d 59, 63 (Md. Ct. Spec. App.), cert. denied, 566 A.2d 101 (Md. 1989). Appellant argues that contributory negligence, if present at all, is a jury question. See Chudson v. Ratra, 548 A.2d 172, 173 (Md. Ct. Spec. App. 1988) ("The absence or presence of contributory negligence is generally a question for the jury."), cert. denied, 552 A.2d 894 (Md. 1989). However, "when the minds of reasonable persons cannot differ ... the court is justified in deciding the question as a matter of law." Id. Here, there is no factual dispute as to whether Thomas returned for follow-up care. He did not return to the Medical Center, even though he was instructed to do so on multiple occasions, until the nurse at the post office health unit insisted he do so. Since this fact is undisputed, it was appropriate for the court to resolve the issue as a matter of law.

8

headaches to the original head injury. He could not testify with certainty as to the effect of any subsequent events on Thomas' current condition. If the medical experts cannot form an opinion with sufficient certainty so as to make a medical judgment, we surely cannot expect a jury to make a decision with sufficient certainty so as to make a legal judgment.

Without evidence that, more likely than not, the failure to perform a CT scan or other diagnostic test on October 23, 1990 was the proximate cause of Appellant's injury, Thomas' claims against the Medical Center cannot survive Defendants' motion for judgment as a matter of law. See Fitzgerald, 679 F.2d at 348 ("[W]here there are a number of possible causes for a plaintiff's disability, the physician's negligence will be regarded as the proximate cause only if the evidence is that it is `more likely' or `probable' that his negligence was such cause than the other possible causes."); see also Weimer, 525 A.2d at 648 ("`If the evidence shows that an injury may have resulted from one of several causes, but only one of the causes can be attributed to the defendant's negligence, the plaintiff must fail.'"). The district court's grant of the motion was, therefore, proper.

B. Summary Judgment in Favor of Dr. del Rosario

The district court determined prior to trial that, as a matter of law, Thomas could not prove his case as to any negligent act allegedly committed by Dr. del Rosario. Appellant maintains that based on the expert testimony of Dr. Maxfield and the requirement that all inferences be drawn in his favor, summary judgment was inappropriate. We review the district court's summary judgment determination de novo, considering the evidence in the light most favorable to the losing party. See Henson v. Liggett Group, Inc., 61 F.3d 270, 274, 275 (4th Cir. 1995). Once the moving party discharges its burden "by showing ... that there is an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), the nonmoving party then "must come forward with `specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); Fed. R. Civ. P. 56(c) (noting that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law").

Summary judgment will be granted unless a "fair-minded jury could return a verdict for the [nonmoving party] on evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 252 (1986).

Again, Appellant's evidence on causation is insufficient to establish, more likely than not, that an act or omission of Dr. del Rosario either contributed to Thomas' hemorrhaging or to the alleged delay in its discovery. Indeed, according to the evidence, Thomas' bleeding may have had its onset after he saw Dr. del Rosario, or may have arisen from the delay caused by his own failure to keep his appointments for the diagnostic tests that Dr. Dee had scheduled for him.[6] Under the circumstances, no jury could reasonably conclude that Thomas met his burden on causation. The district court's grant of summary judgment was, therefore, appropriate.

C. Exclusion of Certain Testimony

Finally, Appellant Thomas challenges the district court's exclusion of certain testimony elicited from Dr. Maxfield and Carlton Romney. We review the district court's decision to exclude testimony for abuse of discretion. See Tyger Construction Co., Inc. v. Pensacola Construction Co., 29 F.3d 137, 142 (4th Cir. 1994), cert. denied, 513 U.S. 1080 (1995).

At trial, Plaintiff asked Dr. Maxfield whether the CT scan would have revealed Thomas' brain injury if it had been taken on October 23, 1990. The district court sustained Defendants' objection to the question. Appellant maintains that the testimony was appropriate under Federal Rule of Evidence 702,[7] since it would "assist the trier

_____

[6] We recognize the evidence in the record that indicates that it is not unusual for an individual who has endured a head injury to become forgetful. There is no record evidence, however, supporting the notion that Thomas' failure to return to the Medical Center for follow-up care was, in fact, due to his injury. Furthermore, Romney took reasonable steps to mitigate against such memory loss: he gave Thomas written instructions, as well as called the post office's health unit to inform the nurse of Thomas' diagnosis and prescribed follow-up care.

[7] Federal Rule of Evidence 702 provides as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

Appellee correctly retorts, however, that there was no factual foundation on which Dr. Maxfield's opinion could rest, making the testimony irrelevant. The evidence indicated that an immediate CT scan may not have shown the presence of bleeding, and there was no evidence that there was, in fact, any bleeding on October 23, 1990. Any opinion, even that of a witness with Dr. Maxfield's experience and training in diagnostic procedure, would have been wholly speculative. See Tyger Construction, 29 F.3d at 142 ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record."). The district court was within its discretion in excluding such evidence.

Second, Appellant argues that the court improperly excluded expert testimony regarding the quality of treatment afforded Thomas. Thomas' counsel asked Dr. Maxfield to provide his "assessment of the treatment of Mr. Thomas." Defendants' counsel objected, and the district court sustained the objection. We find no clear abuse of discretion in the district court's determination, especially since the court allowed the testimony once Plaintiff's counsel provided the proper foundation and correctly phrased the inquiry. Plaintiff's counsel later asked Dr. Maxfield, "within a reasonable degree of medical certainty, do you have an opinion with respect to the care that was rendered to Mr. Thomas on [October 23, 1990] by Mr. Romney, the physician assistant?" Dr. Maxfield replied in the affirmative and then stated his opinion. We will not reverse a district court's evidentiary decision under such circumstances.

Relatedly, Thomas' counsel later inquired of Dr. Maxfield if the Medical Center's failure to schedule a follow-up appointment with Thomas was a violation of the standard of care. Again, the district court sustained Defendants' objection. Appellees argue that, although Dr. Maxfield articulated a standard of care, he did not provide any supporting evidence, such as relevant literature in the field, or testify to customary practices in the medical profession. See Alevromagiros v. Hechinger Co., 993 F.2d 417, 421, 422 (4th Cir. 1993) (rejecting expert testimony unsupported by any evidence). Rather, he simply stated his own subjective opinion. See id. at 421 ("[W]e are unpre-

11

pared to agree that `it is so if an expert says it is so.'"). Under the circumstances, it was proper for the court to exclude such testimony.

Third, the court sustained an objection to a question that elicited Dr. Maxfield's opinion regarding Thomas' medical condition at the time of trial. The court so ruled because Appellant had not supplemented his pretrial disclosures regarding Dr. Maxfield's anticipated trial testimony to include these matters. Under Federal Rule of Civil Procedure 26(e)(1), "[a] party is under a duty to supplement ... its disclosures ... if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." This duty extends to the testimony of an expert witness, Fed. R. Evid. 26(e)(1), who prior to testimony is required to submit a report outlining the opinions to be expressed and the data supporting the opinions, Fed. R. Evid. 26(a)(2)(B).

The district court's decision barring expert testimony that had not been previously disclosed in accordance with Rules 26(a)(2)(B) and 26(e)(1) was well within the court's discretion to manage its proceedings to ensure that there be no unfair surprise at trial.[8] See American Casualty Co. v. Baker, 22 F.3d 880, 886 n.3 (9th Cir. 1994) (noting that "the district court was within its discretion by precluding expert testimony as a sanction for the [defendant's] failure to seasonably supplement its interrogatory responses pursuant to Federal Rule of Civil Procedure 26(e)(1)"); Hancock v. Hobbs , 967 F.2d 462, 468 (11th Cir. 1992) (finding no abuse of discretion where district court excluded expert testimony because party advancing testimony did not comply with Rule 26(e)(1)); Thibeault, 960 F.2d at 248 (finding no abuse of discretion where district court precluded expert testimony because plaintiff "failed seasonably to supplement his answers as

_____

[8] We might add that Appellant presents no legitimate reason for his failure to supplement his pretrial disclosures as required under Rule 26(e)(1), a fact that only buttresses our support for the district court's ruling. See Thibeault v. Square D Co., 960 F.2d 239, 247 (1st Cir. 1992) (affirming district court's decision to exclude expert testimony where plaintiff provided "no good cause" for its failure to supplement its disclosures in a timely way).

12

required by Rule 26(e)"). Indeed, it would have been an abuse of discretion for the district court not to exclude the testimony, since such a practice would allow the party proffering the testimony to notify the other side of its substance for the first time while the witness was on the stand -- clearly circumventing the purpose of Rule 26(e)(1) and creating a situation possibly prejudicial to the adverse party. See Thibeault, 960 F.2d at 244 (noting that "Rule 26 increases the quality of trials by ... minimizing surprise") (internal citations omitted); see also Fed. R. Evid. 37(c)(1) ("A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial ... any witness or information not so disclosed.").

Even if Thomas had not violated Rule 26(e)(1), however, the court still would have been within its discretion to exclude Dr. Maxfield's testimony regarding Thomas' current medical condition. As the district court recognized, Thomas' treating physician, Dr. Batipps, had already testified about Thomas' current condition. Additional testimony on the same subject would have amounted to"needless presentation of cumulative evidence." Fed. R. Evid. 403; see also Talkington v. Artria Reclamelucifers Fabrieken BV, 152 F.3d 254, 266 (4th Cir.) (concluding that any error in admitting evidence would be harmless since evidence was cumulative), cert. dismissed , 119 S.Ct. 634 (1998). As such, Dr. Maxfield's testimony was well within the district court's broad discretion to exclude evidence. We, therefore, will not disturb the court's ruling.

Finally, Plaintiff asked Romney, the physician's assistant who cared for Thomas the night of his injury, "Do you know why a doctor or a health professional would order a CT scan or an MRI ... Why don't you tell us?" Again, the district court sustained Defendants' objection, determining that the question called for speculation. Romney was a fact witness, not an expert, and therefore was not qualified to render an opinion on the motivation of doctors. The court acted properly in excluding such testimony.[9]

_____
[9] Even if the court had committed some error with respect to the exclusion of any testimony, which we do not believe to be the case, it would be harmless since the testimony would not have remedied the lack of

13

III.

In summary, we conclude that the district court did not err in granting the Medical Center judgment as a matter of law and Dr. del Rosario summary judgment. Furthermore, we find no reversible error with respect to the district court's exclusion of certain testimony. Accordingly, the judgment below is affirmed.

AFFIRMED

_____

causation in Appellant's evidence. Even with the excluded testimony, Thomas is unable to demonstrate that some act or omission by the Medical Center proximately caused his injury, so his claims must fail. See Talkington, 152 F.3d at 266 (determining that any error in admitting evidence would be harmless since evidence did little to support plaintiff's theory of case); see also Fed. R. Evid. 103(a) (noting that an "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected").

14