959 A.2d 778

**Charles MARCANTONIO, Personal Representative
of The Estate of Sherri Schaefer, et al.**

v.

**Melissa MOEN, M.D., et al.**

**No. 4, Sept. Term, 2008.**

Court of Appeals of Maryland.

Nov. 5, 2008.

Jack A. Gold (Lawrence S. Lapidus of Karp, Frosh, Lapidus, Wigodsky & Norwind, P.A., Rockville; Anthony G. Newman of Newman & McIntosh, Bethesda), on brief, for petitioners.

George S. Tolley, III, Dugan, Babij & Tolley, LLC, Timonium, David M. Kopstein, Kopstein & Perilman, Seabrook, brief of Amicus Curiae Maryland Trial Lawyers Ass'n.

Barry J. Nace, Christopher T. Nace, Jonathan B. Nace, Paulson & Nace, Washington, DC, amicus curiae brief of Karen Costello.

Marianne DePaulo Plant (Craig B. Merkle and Jason B. Penn of Goodell, DeVries, Leech & Dann, LLP; Thomas C. Marriner of Wharton, Levin, Ehrmantraut & Klein, Annapolis; Catherine W. Steiner of Whiteford, Taylor & Preston, LLP, Baltimore), all on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned), IRMA S. RAKER (Retired, Specially Assigned) and ALAN M. WILNER (Retired, Specially Assigned), JJ.

GREENE, J.

In this case we must determine whether the Circuit Court for Anne Arundel County erred in striking the affidavits of two proposed expert witnesses pursuant to Maryland Rule 2–501(e). Because we conclude that it was error to strike the affidavits, we shall hold that the Circuit Court improperly granted summary judgment in favor of Respondents, Melissa Moen, M.D. et. al ("The Medical Providers"),[1] on the basis that Petitioners, Charles Marcantonio, et al. ("Marcantonios"), failed to establish that The Medical Providers' negligence was the proximate cause of Sherri Schaefer's death.

## I.

In August of 2000, Sherri Schaefer visited her gynecologist, Melissa Moen, M.D., and informed Dr. Moen that she was experiencing abnormal vaginal bleeding. It is alleged that Dr. Moen ordered a transabdominal and transvaginal pelvic ultrasound to aid her in determining the cause of the bleeding, but failed to perform an endometrial biopsy at that time.[2] The ultrasound was performed on September 11, 2000, and subsequently interpreted by radiologist, Paula DeCandido, M.D. When interpreting the ultrasound, Dr. DeCandido failed to report a 1.5 centimeter mass located on Ms. Schaefer's right ovary.

After the August and September, 2000 visits, Ms. Schaefer continued to experience physical problems and complained to Dr. Moen of pelvic symptoms and irregular bleeding. In April of 2001, Dr. Moen performed an endometrial biopsy of Ms.

---

**1.** "The Medical Providers" refers to Respondents Melissa Moen M.D., Paula DeCandido, M.D., Anne Arundel Diagnostics, Inc., Womens OB/GYN, P.A., and Anne Arundel Medical Center, Inc.

**2.** The National Cancer Institute, Dictionary of Cancer Terms, defines endometrial biopsy as "a procedure in which a sample of tissue is taken from the endometrium (inner lining of the uterus) for examination under a microscope." http://www.cancer.gov/dictionary (last visited Oct. 14, 2008). There is a dispute between the parties as to whether Dr. Moen recommended that an endometrial biopsy be performed during the August 2007 visit.

Schaefer's uterus and discovered that Ms. Schaefer had endometrial cancer. In May of 2001, after being diagnosed with cancer, Ms. Schaefer began treatment with Robert Bristow, M.D., a gynecological oncologist, at the Johns Hopkins Medical Center. Dr. Bristow operated on Ms. Schaefer in June of 2001; however, the operation did not help Ms. Schaefer survive her cancer. Dr. Bristow continued to treat Ms. Schaefer until her death on May 18, 2005.

Prior to her death, Ms. Schaefer and her husband, Charles Marcantonio, filed a cause of action for medical negligence against The Medical Providers alleging that they negligently failed to diagnose and treat Ms. Schaefer's endometrial and ovarian cancer in August and September of 2000. Specifically, the complaint alleged that Dr. Moen breached the applicable standard of care by failing to perform an endometrial biopsy in August of 2000 and that Dr. DeCandido breached the standard of care by failing to report the 1.5 centimeter mass disclosed as a result of Ms. Schaefer's September 2000 ultrasound. After Ms. Schaefer's death, Charles Marcantonio amended the complaint to add wrongful death and survivorship claims against The Medical Providers.

## II.

The depositions of two of the Marcantonios' expert witnesses, Drs. Hutchins and Shmookler, are pertinent to our review of this case. At his deposition, Dr. Hutchins testified that he believed to a reasonable degree of medical probability that Dr. Moen departed from the applicable standard of care in failing to perform an endometrial biopsy of Ms. Schaefer's uterus during or shortly after Ms. Schaefer's August 2000 visit. Dr. Hutchins opined that if Dr. Moen had performed the endometrial biopsy, she would have been able to properly diagnose and treat Ms. Schaefer's condition. Dr. Hutchins' exact words were as follows:

> My opinion is that in response to the abnormal bleeding [Dr. Moen] was required to do an endometrial biopsy as soon as is possible. The longer you wait, the more likely

the patient is to suffer the consequences of the delay. And the whole time period from the 25th of August until ultimately the biopsy was done, in that whole time period, I guess we would have to say until [Dr. Moen] did it, she was in breach of the standard of care.

Moreover, Dr. Hutchins indicated that had Ms. Schaefer's condition been properly diagnosed and treated in August or September of 2000, she would have had an 80 percent chance of survival. During the course of the deposition, the following exchange also occurred:

Counsel: Are you going to be rendering an opinion within reasonable medical probability as to M[s]. Schaefer's cause of death?

Dr. Hutchins: No.

In a subsequent affidavit, Dr. Hutchins stated:

This will confirm that I hold the following opinion within a reasonable degree of medical probability: Dr. Moen's failure to properly diagnose Ms. Scheaffer's [sic] condition as an early carcinoma of the uterus, and/or a precancerous lesion and/or some form of hyperplasia in August or September of 2000 and the resultant failure to begin immediate treatment were the proximate cause of Ms. Scheaffer's [sic] death.

The second expert witness, Dr. Shmookler, testified at his deposition that the 1.5 centimeter mass on Ms. Schaefer's right ovary that Dr. DeCandido failed to report in September of 2000 was in all probability benign, yet a precursor to cancer. He went on to opine that had Ms. Schaefer's condition been properly diagnosed in September 2000, that in all medical probability, her cancer would have been curable. Later in his deposition, the following exchange occurred:

Counsel for The Medical Providers: Do you have an opinion to a reasonable degree of medical probability as to what [Ms. Schaefer's] staging [3] was in July of 2001?

---

3. Staging involves "[p]erforming exams and tests to learn the extent of the cancer within the body, especially whether the disease has spread from the original site to other parts of the body. It is important to

Dr. Shmookler: No, I don't, because as I said, that's more—particularly in a case like this, I would defer to the oncologist or gynecologic oncologist. They would stage this.

\* \* \*

Counsel for The Medical Providers: Do you have an opinion within reasonable medical probability as to Ms. Schaefer's prognosis [4] in May of 2001?

Dr. Shmookler: Not as far as survival or anything like that. I'm not going to be going into that.

\* \* \*

Counsel for Dr. Shmookler: Just so counsel is clear, [Dr. Shmookler] does have an opinion as to whether the cancer could have been cured if the treatment was rendered back at the time of the sonogram. It's not exactly your question, but I don't want you to be surprised at trial if [Dr. Shmookler] renders opinions as to the histopathology [5] and the—whether it was curable earlier on.

\* \* \*

Counsel for The Medical Providers: Do you have an opinion as to Ms. Schaefer's prognosis at any point in time from August 2000 through July of 2001?

Dr. Shmookler: Well, I believe, at the time of the sonogram, the first sonogram, which was . . . September of 2000 again,

---

know the stage of the disease in order to plan the best treatment." National Cancer Institute, Dictionary of Cancer Terms, http://www. cancer.gov/dictionary (last visited Oct. 14, 2008).

4. The National Cancer Institute, Dictionary of Cancer Terms, defines prognosis as "[t]he likely outcome or course of a disease; the chance of recovery or recurrence." http://www.cancer.gov/dictionary (last visited Oct. 14, 2008).

5. The National Cancer Institute, Dictionary of Cancer Terms, defines histopathology as "the study of diseased cells and tissues using a microscope." http://www.cancer.gov/dictionary (last visited Oct. 14, 2008).

as far as the ovary, as I said, we know there was a complex mass there. We also know that it was one to one and a half centimeters. I believe at that point it was, as I said earlier, a cystadenoma, which is a benign tumor, so there is no chance of metastasis there, and I also mentioned that the endometrial tumor was in a much earlier stage, that it was not invasive, it was probably atypical hyperplasia or maybe carcinoma in situ, so I think, had that been diagnosed in September of 2000, in all medical probability that uterine cancer would have been curable.

In a subsequent affidavit, Dr. Shmookler stated:

I have reviewed the pathology slides of the decedent, Sherri Scheaffer [sic], as well as the original endometrial biopsy and other medical records. I provided a deposition at the request of the defendants to this action.... The failure to properly evaluate the ovarian tumor of Sherri Scheaffer [sic] in September of 2000, when it was in an early stage, was a substantial factor in proximately causing her death.

Upon motions by The Medical Providers, the Circuit Court for Anne Arundel County struck the affidavits of Drs. Shmookler and Hutchins on the basis that the affidavits materially contradicted the experts' deposition testimony in violation of Maryland Rule 2-501(e).[6] Subsequently, the Cir-

---

6. Maryland Rule 2-501(e), **Contradictory Affidavit or Statement.**

(1) A party may file a motion to strike an affidavit or other statement under oath to the extent that it contradicts any prior sworn statement of the person making the affidavit or statement. Prior sworn statements include (A) testimony at a prior hearing, (B) an answer to an interrogatory, and (C) deposition testimony that has not been corrected by changes made within the time allowed by Rule 2-415.

(2) If the court finds that the affidavit or other statement under oath materially contradicts the prior sworn statement, the court shall strike the contradictory part unless the court determines that (A) the person reasonably believed the prior statement to be true based on facts known to the person at the time the prior statement was made, and (B) the statement in the affidavit or other statement under oath is based on facts that were not known to the person and could not reasonably have been known to the person at the time the prior statement was made or, if the prior statement was made in a deposition, within the time allowed by Rule 2-415(d) for correcting the deposition.

cuit Court granted The Medical Providers' joint motion for summary judgment on all counts against the Marcantonios, concluding that the Marcantonios had failed to provide sufficient evidence that The Medical Providers' negligence proximately caused Ms. Schaefer's death. The Circuit Court elaborated on its conclusion as follows:

The Court will grant the Defense motions for summary judgment, because I think that the case of *Fennell v. Southern Maryland Hospital,* 320 Md. 776 [580 A.2d 206], is controlling in the sense that the [Marcantonios], even assuming the things that have been pointed out in the depositions, have not offered evidence that would establish proximate causation of 51 percent or more of the chance of loss ... of survival.

A majority of the Court of Special Appeals agreed with the Circuit Court's conclusion that the affidavits of Drs. Hutchins and Shmookler materially contradicted the experts' deposition testimony. *Marcantonio v. Moen,* 177 Md.App. 664, 937 A.2d 861 (2007). In regard to the decision to strike Dr. Hutchins' affidavit, the intermediate appellate court[7] reasoned as follows:

At deposition, Dr. Hutchins flatly said he was not going to be giving an opinion as to the cause of Ms. Schaefer's death. In his affidavit, Dr. Hutchins expressed an opinion as to the cause of Ms. Schaefer's death. In other words, without any explanation (*see* Md. Rule 2–501(e)(2)), Dr. Hutchins did the exact opposite of what he said at deposition that he was not going to do. It is difficult to imagine a more stark contradiction than the one complained about by [The Medical Providers].

*Marcantonio,* 177 Md.App. at 693, 937 A.2d at 878. Pertaining to Dr. Shmookler's affidavit, the court reasoned:

[I]n a case of this sort, it is highly relevant as to what a decedent's chance of survival is at the time the appropriate

---

7. All references to the intermediate appellate court or Court of Special Appeals refer to the majority's opinion unless otherwise noted.

treatment commenced. Without an opinion in that regard, no expert, no matter how well qualified, can say in a case like this whether it is more probable than not that a healthcare provider's negligence caused the patient's death. We therefore agree with the circuit court and with [The Medical Providers] that there was a material contradiction between what Dr. Shmookler told the attorneys in deposition and what he said in his affidavit.

*Marcantonio,* 177 Md.App. at 697, 937 A.2d at 880. The Court of Special Appeals concluded that "without [the affidavits of Drs. Shmookler and Hutchins], summary judgment was appropriate because the evidence, taken in a light most favorable to the [Marcantonios], showed only a possibility that [The Medical Providers'] negligence caused Ms. Schaefer's death." *Marcantonio,* 177 Md.App. at 691, 937 A.2d at 877. In a dissenting opinion, Judge Meredith concluded that the "[t]he affidavits were not irreconcilably at odds with the opinions expressed by [the experts] at their depositions, and ... should not have been considered mere shams subject to being stricken under Rule 2–501(e)." *Marcantonio,* 177 Md.App. at 706, 937 A.2d at 885 (Meredith, J., dissenting). We granted the Marcantonios' petition for writ of certiorari,[8] *Marcantonio v. Moen,* 404 Md. 152, 945 A.2d 1270 (2008), and for the reasons

---

**8.** The Marcantonios presented the following questions in their petition for certiorari:

1. Whether a genuine issue of material fact exists on the question of proximate cause in a wrongful death and survival action arising from medical malpractice, where the evidence demonstrates that the defendants' negligent failure to diagnose and treat stage one cancer (at which time the patient only had a 1–in–5 chance of dying from the disease) allowed the cancer to progress to stage III–C (at which time the risk of death had more than doubled), and the patient ultimately died from metastatic cancer.

2. Whether, pursuant to Rule 2–501(e), expert witness affidavits stating that [The Medical Providers'] negligent failure to detect and treat was the proximate cause of death "materially contradict" the experts' prior deposition testimony, wherein one expert indicated he would not be rendering an opinion on causation, and the other expert indicated he would not be rendering an opinion on the patient's prognosis when the proper diagnosis and treatment began several months after the defendants' failure to diagnose.

stated herein, we shall reverse the judgment of the Court of Special Appeals.

## III.

### Rule 2–501 (e), Contradictory Affidavits or Statements

The "sham affidavit" rule is a doctrine that was first articulated by the Second Circuit in *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir.1969). Collin J. Cox, *Reconsidering the Sham Affidavit Doctrine*, 50 DUKE L.J. 261, 267 (2000). Since *Perma*, the doctrine has been adopted, to some extent, by every federal circuit and many state courts. *Shelcusky v. Garjulio*, 172 N.J. 185, 797 A.2d 138, 144–45 (2002). This Court first considered the sham affidavit rule in *Pittman v. Atlantic Realty*, 359 Md. 513, 754 A.2d 1030 (2000) where we summarized the rule, as originally articulated in *Perma*, as follows:

> "Stated strictly, the *Perma* [sham affidavit] rule is that, if an interested party has personal knowledge of the relevant facts, and if that party cannot explain a material contradiction between deposition testimony and a subsequent affidavit by the acquisition of newly acquired evidence, then a trial court may disregard the affidavit as a 'sham,' *i.e.*, as one failing to 'raise [ ] any issue which [the trial court] can call genuine.'"

*Pittman*, 359 Md. at 529, 754 A.2d at 1038. In *Pittman*, we declined to adopt the *Perma* sham affidavit rule, or any variation thereof, utilized by the federal courts. Because the reasoning and analysis in *Pittman* is dispositive to our interpretation of Maryland Rule 2–501(e), we discuss the opinion at some length below.

In *Pittman*, Shari Hall ("Hall") and her young son, Terran, filed an action against the owners of a residential property. 359 Md. at 518, 754 A.2d at 1032. The complaint alleged that Terran had become ill due to lead paint exposure while at the property. *Id.* During discovery, Hall provided "vague, confused and inconsistent" information pertaining to the duration of Terran's stay at the subject premises. *Pittman*, 359 Md. at

519, 754 A.2d at 1033. In response to interrogatories, Hall indicated that Terran lived at the premises from 1992 to 1993 and was cared for there from 8:00 am to 4:00 pm Monday through Friday. *Id.* At deposition, however, Hall indicated that Terran lived at the premises for a maximum of two months and visited the premises around two times per week before residing there and three to four times a week after residing there. *Pittman,* 359 Md. at 520–21, 754 A.2d at 1034. Based on the information that Hall provided at her deposition, her and Terran's causal relation expert, Howard Klein, M.D., opined that a two month residency was an insufficient period of exposure to make the premises a substantial factor in causing Terran's injuries. *Pittman,* 359 Md. at 522–23, 754 A.2d at 1034–35.

Citing Dr. Klein's deposition testimony, the defendants moved for summary judgment and asserted that Hall had failed to establish that exposure to lead at the subject premises was a substantial causal factor in bringing about Terran's injuries. *Pittman,* 359 Md. at 523, 754 A.2d at 1035. In opposition to the motion for summary judgment, Hall submitted an affidavit stating that Terran lived at the residence for longer than five months and visited the premises for seven to eight hours daily before and after living there. *Id.* In light of this information, Dr. Klein also filed an affidavit opining that the presence of lead paint in the subject premises was a substantial cause of Terran's elevated blood lead levels. *Pittman,* 359 Md. at 524, 754 A.2d at 1036. The Circuit Court for Baltimore City struck the affidavits, concluding that they significantly contradicted Hall's deposition testimony.[9] *Pittman,* 359 Md. at 524–25, 754 A.2d at 1036. As a result of striking the affidavits, the motions court granted summary judgment. *Pittman,* 359 Md. at 529, 754 A.2d at 1036. The Court of Special Appeals affirmed the Circuit Court's grant of summary judgment, thereby approving the trial judge's deci-

---

**9.** The court also struck an affidavit submitted by Terran's grandmother, Gladys Hall, because the affidavit varied from Gladys Hall's deposition testimony regarding the duration that Terran and Shari Hall lived at the subject premises. *Pittman,* 359 Md. at 524–25, 754 A.2d at 1036.

sion to strike the affidavits, and in doing so, adopted the sham affidavit rule as articulated by the federal courts. *Pittman,* 359 Md. at 526, 754 A.2d at 1036–37.

This Court reversed, holding that the sham affidavit rule was inconsistent with Maryland law because the rule improperly shifts credibility determinations from the trier of fact to the trial court on summary judgment. *Pittman,* 359 Md. at 540–42, 754 A.2d at 1041. In so holding, we stated:

> If we were to adopt the sham affidavit rule in order to address what may be a relatively small number of cases in which sham affidavits are presented, the downside possibly would be an increase in the filings of summary judgment motions that are based on an attempt to convince the trial court that some variation in the nonmovant's affidavit was completely and inexplicably contradictory and that the variation was not simply a clarification or an elaboration. If a need develops for a sham affidavit rule, that need ordinarily would be discerned initially by our Standing Committee on the Rules of Practice and Procedure.

*Pittman,* 359 Md. at 541–42, 754 A.2d at 1045.

In 2003, the Rules Committee recommended amending Maryland Rule 2–501 to include a subsection that addresses contradictory affidavits or statements. 30 Md. Reg. 1907–08 (Dec. 26, 2003). The Reporter's Note accompanying the Rules Committee's recommendation indicates that the proposed amendment was "intended to respond to the Court of Appeals' invitation in *Pittman v. Atlantic Realty Co.,* 359 Md. 513, 754 A.2d 1030 (2000), for the Rules Committee to study the issue of 'sham affidavits.' " 30 Md. Reg. 1125 (Aug. 22, 2003). The Court acted on the Rules Committee's recommendation and amended Maryland Rule 5–201 to include subsection (e) In relevant part Rule 2–501(e) specifically provides that "[i]f the court finds that the affidavit or other statement under oath materially contradicts the prior sworn statement, the court shall strike the contradictory part...."

In the instant case, The Medical Providers argue that the plain language of Rule 2–501(e) mandates that the Rule ap-

plies any time an affiant contradicts any prior sworn statement and not only when an affiant irreconcilably contradicts a prior statement of fact. They further maintain that the Circuit Court appropriately applied Rule 2–501(e) when striking the affidavits of Drs. Hutchins and Shmookler. According to The Medical Providers, Dr. Hutchins' affidavit materially contradicts his prior deposition testimony because the affidavit renders an opinion as to the cause of Ms. Schaefer's death, whereas at his deposition, Dr. Hutchins stated he was not going to be giving an opinion on this matter.[10]

As to Dr. Shmookler, The Medical Providers contend that Dr. Shmookler materially contradicted his deposition testimony that he did not have an opinion as to Ms. Schaefer's staging in July of 2001 or prognosis in May of 2001 by later stating in his affidavit that the failure to properly evaluate Ms. Schaefer's tumor in September of 2000 was a substantial factor in proximately causing her death. The Medical Providers also contend that it was a material contradiction for Dr. Shmookler to give an opinion as to the cause of Ms. Schaefer's death via affidavit when Dr. Shmookler stated at his deposition that he would defer to a oncologist or gynecological oncologist regarding Ms. Schaefer's July 2001 staging.[11]

The Marcantonios counter that the affidavits of Drs. Hutchins and Shmookler do not materially contradict the experts' earlier deposition testimony and that the Circuit Court errone-

---

**10.** The Medical Providers also argue that the opinion in Dr. Hutchins' affidavit was outside of his area of expertise and thus, inadmissible under Maryland Rule 5–702. They further contend that the affidavit does not relate to Dr. DeCandido and Anne Arundel Medical Center. We decline to make a determination on these issues as they were not the basis upon which the Circuit Court struck the affidavits in the proceedings below.

**11.** The Medical Providers also contend that Dr. Shmookler's affidavit is legally insufficient to establish a *prima facie* case that the alleged failure to diagnose proximately caused Ms. Schaefer's death because none of the contentions therein are expressed to a reasonable degree of medical probability or certainty. We do not address the merit of this contention, either, because it is not the basis upon which the Circuit Court struck the affidavit.

ously struck those documents. The Marcantonios urge that *Pittman* is instructive in determining if the affidavits in this case materially contradict the experts' earlier deposition testimony. They further point out that, in *Pittman*, the Court stated that, theoretically, the sham affidavit rule only applies when there is a flat contradiction of material fact between deposition testimony and affidavits opposing summary judgment.

The Marcantonios contend that neither Dr. Hutchins' nor Dr. Shmookler's affidavit contains flat contradictions of material fact. They posit that Dr. Hutchins did not state that he *could not* render an opinion as to causation, or that The Medical Providers' negligence was *not* a cause of Ms. Schaefer's death. Rather, they assert, that at the time of deposition, Dr. Hutchins simply conveyed that he did not intend to render an opinion as to causation. The Marcantonios' argument in regard to Dr. Shmookler is that, his act of providing an opinion regarding the ramifications of the failure to properly evaluate Ms. Schaefer's tumor in *September* of 2000 does not materially contradict his statements that he would defer to another type of specialist as to her prognosis in *May* of 2001 or would not be rendering an opinion as to her staging in *July* of 2001.

We hold that the affidavits of Drs. Hutchins and Shmookler do not materially contradict their respective deposition testimony within the meaning of Rule 2–501(e).[12] Rule 2–501(e) does not define "material contradiction," and thus, we interpret the terms as they are ordinarily and popularly understood in the English language. *See King v. State,* 400 Md. 419, 429, 929 A.2d 169, 175 (2007) (noting that when construing a rule, we must first look to the words of the rule, giving them their ordinary and plain meaning). A contradiction is an "act of contradicting"; to contradict means to "express or assert the opposite of a statement." WEBSTER'S II

---

12. We do not address whether the affidavits complied with the applicable scheduling order because that is not the basis upon which the Circuit Court struck the affidavits in the proceedings below.

NEW COLLEGE DICTIONARY 251 (3d ed. 2005); *See also Kucharc-zyk v. State*, 235 Md. 334, 338, 201 A.2d 683, 685 (1964) ("When a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is too inconclusive, contradictory, and uncertain to be the basis of a legal conclusion."). A contradictory statement or action is material if it is significant or essential. BLACK'S LAW DICTIONARY 998 (8th ed. 2004); *See also Miller v. Bay City*, 393 Md. 620, 631, 903 A.2d 938, 945 (2006) (indicating that a fact is material if it "affect[s] the outcome of the case"). Accordingly, a material contradiction under 2–501(e) is a factual assertion that is significantly opposite to the affiant's previous sworn statement so that when examined together the statements are irreconcilable.[13] *Cf. Pittman*, 359 Md. at 542, 754 A.2d at 1045 (indicating that the sham affidavit rule applies to "flat" contradictions of material fact).

This definition of material contradiction addresses concerns raised by affidavits like Shari Hall's in *Pittman*. During the Rules Committee's deliberations on the issue of sham affidavits, the Committee Chair [14] characterized Hall's affidavit as a "180 degree recantation that was difficult to believe." *Minutes of the Court of Appeals Standing Committee on the Rules of Practice and Procedure*, 56–57 (Nov. 17, 2000). *Pittman* thus provides an example of an affidavit that contains a "material contradiction" that would be properly struck under Rule 2–501(e). Hall's affidavit contained factual statements that were irreconcilable with her previous deposition testimony. In other words, both Hall's affidavit and her prior statements could not have been true. Terran and Shari Hall

---

**13.** We thus agree, with Judge Meredith's dissenting opinion in *Marcantonio*, where he concluded that the experts' affidavits did not contain material contradictions because they were not "irreconcilably at odds with the opinions expressed by [the experts] at their deposition." *Marcantonio v. Moen*, 177 Md.App. 664, 706, 937 A.2d 861, 885 (2007) (Meredith, J., dissenting).

**14.** The Hon. Joseph F. Murphy, Jr. served as Chair of the Rules Committee at this time.

could not have both lived at the subject premises for five-and-a-half months and for a maximum of two months.

*Hinch v. Lucy Webb Hayes Nat. Training,* 814 A.2d 926 (D.C.2003), however, provides an example of an affidavit that does not materially contradict prior sworn testimony. *Hinch* is similar to the case at bar. In *Hinch,* the trial court granted summary judgment in favor of the defendants as to the medical negligence claim, on the basis that the plaintiff had failed to provide sufficient evidence of causation. 814 A.2d at 928. The court reached that conclusion after striking the affidavit of the plaintiff's expert witness wherein the expert stated to a reasonable degree of medical certainty that the defendant's negligence caused the plaintiff's injuries. *Id.* The court found the expert's affidavit to be a sham because it contradicted the expert's earlier deposition testimony, where the expert indicated that she could not "tease apart" which of several possible causes of the plaintiff's injury was the actual cause of the injury. *Hinch,* 814 A.2d at 931.

On appeal, in *Hinch,* the District of Columbia Court of Appeals reversed the trial court's grant of summary judgment on the basis that the court improperly struck the expert's affidavit. *Id.* After offering a detailed explanation of the sham affidavit doctrine, the court held that it was too far of a "stretch" to apply the doctrine to situations where the expert's testimony was not "unambiguously and directly" contradictory. *Id.* The court concluded that the expert's statement that the defendant's negligence more likely than not caused the plaintiff's injury, did not materially contradict the expert's earlier deposition testimony where she stated that she could not "tease apart" which of several possible causes actually caused the plaintiff's injury. *Id.* The court found these statements reconcilable, reasoning: "[a]t a minimum, for the sham affidavit doctrine to apply, there must be a clear and explicit contradiction between what is said at deposition and what is said in the affidavit." *Id.*

Other jurisdictions also have determined that an affidavit contains material contradictions only when the assertions con-

tained in the affidavit are significantly contradictory to, or irreconcilable with, the affiant's prior sworn testimony. *See Shelcusky,* 797 A.2d at 149 (indicating that a court should not exclude an affidavit if it does not "patently" and "sharply" contradict earlier deposition testimony); *Tippens v. Celotex Corp.,* 805 F.2d 949, 954–55 (11th Cir.1986) (concluding that when an affiant indicated at three places in the deposition testimony that an agreement contained no requirement to purchase a building in order to obtain a contract, the affiant's affidavit that stated there was an agreement to purchase a building in order to obtain a contract, represented "the type of irreconcilable conflict that amounts to a transparent sham which should be disregarded"); *Webster v. Sill,* 675 P.2d 1170 (Utah 1983) (holding that an affidavit that stated the affiant slipped on wet grass materially contradicted the affiant's deposition testimony where the affiant stated that he had not noticed the grass was wet or slippery); *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 894 (5th Cir.1980) (stating that, "[c]ertainly, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence").

Interpreting the terms "material contradiction" to apply to irreconcilable statements of material fact comports with and furthers the purpose of the Maryland summary judgment procedure. Such an interpretation ensures that subsection (e) is utilized to strike affidavits that contain factual assertions that are not genuine. *See Pittman,* 359 Md. at 534, 754 A.2d at 1041 ("[C]ourts that have adopted the sham affidavit rule have said that '[t]he very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial.' ") (quoting *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir.1975)). Yet, our interpretation of a material contradiction also observes the lessons of *Pittman* by preventing the motions court from making credibility determinations. *See Baltimore v. Kelly,* 391 Md. 64, 73, 891 A.2d 1103, 1108 (2006) (indicating that although summary judgment is useful in "facilitat[ing] the

efficient disposition of litigation" in appropriate circumstances, its function is not to make credibility determinations or factual findings); *See also Taylor v. NationsBank,* 365 Md. 166, 174, 776 A.2d 645, 650 (2001) ("Evidentiary matters, credibility issues, and material facts which are in dispute cannot properly be disposed of by summary judgment.").

In the instant case, Dr. Hutchins' affidavit does not make a factual assertion that irreconcilably contradicts his prior sworn testimony. Rather, Dr. Hutchins' affidavit appears to supplement the testimony he provided at deposition.[15] At deposition, Counsel asked Dr. Hutchins if he was going to be rendering an opinion as to causation and Dr. Hutchins responded no. It is quite conceivable that Dr. Hutchins did not intend to render an opinion as to causation at the time of his deposition, and yet later decided to offer one. Although Dr. Hutchins' affidavit is inconsistent with the intention he expressed at his deposition; it is not factually contradictory to, or irreconcilable with, his deposition testimony. Dr. Hutchins did not state at deposition that he *could not* render an opinion as to causation or that it was *unlikely* that The Medical Providers' failure to diagnose Ms. Schaefer's cancer caused her death. Thus, we conclude that it was not a material contradiction for Dr. Hutchins to at one point indicate that he did not intend to do something, and then later in spite of his earlier inclination, to do that thing he originally did not intend to do.

Dr. Shmookler's affidavit also does not make a factual assertion that plainly contradicts his prior sworn testimony. At his deposition, Counsel asked Dr. Shmookler if he had an opinion as to Ms. Schaefer's June 2001 staging and Dr. Shmookler responded that he would defer to a gynecological oncologist or oncologist. Counsel asked Dr. Shmookler if he had an opinion as to Ms. Schaefer's May 2001 prognosis and Dr. Shmookler responded he would not be going into that. Dr. Shmookler also stated at deposition, however, that he

---

15. In his dissenting opinion, Judge Meredith also characterized Dr. Hutchins' and Dr. Shmookler's affidavits as supplemental opinions. *Marcantonio,* 177 Md.App. at 706, 937 A.2d at 885 (2007).

believed that Ms. Schaefer's cancer would have been curable if The Medical Providers had properly diagnosed it in September of 2000. Later, Dr. Shmookler indicated in his affidavit that the failure to properly evaluate Ms. Schaefer's ovarian tumor in September of 2000 was a substantial factor in causing her death.

In our view, Dr. Shmookler's opinion regarding the failure to diagnose the tumor in September does not materially contradict his lack of opinion as to Ms. Schaefer's staging or prognosis in May or June. We disagree with the Court of Special Appeals' conclusion that because Dr. Shmookler did not have an opinion as to Ms. Schaefer's prognosis after she commenced the appropriate treatment for her cancer, that he could not state whether it was more probable than not that a healthcare provider's negligence caused Ms. Schaefer's death. The statements regarding May and June of 2001 are not factually irreconcilable with the statement regarding September of 2000. While it is possible that a reasonable trier of fact might find Dr. Shmookler's affidavit less *credible* in light of his deposition testimony, the motions court does not and should not make credibility determinations when striking an affidavit pursuant to 2-501(e).

### Proximate Cause

 Because we determine that the Circuit Court incorrectly struck the affidavits of Drs. Shmookler and Hutchins, we hold that the Court erroneously entered summary judgment on the basis that the Marcantonios failed to establish sufficient evidence of proximate cause.[16] Proximate cause

---

16. After striking the affidavits, the Circuit Court held that the Marcantonios had failed to establish proximate causation because the evidence admitted did not indicate that The Medical Providers' alleged negligence proximately caused Ms. Schaefer's injuries and death. This evidence revealed that at the time The Medical Providers' allegedly failed to diagnose Ms. Schaefer's cancer, she had up to an 80 percent chance of surviving the disease. The evidence also provided, however, that when gynecological oncologist, Dr. Bristow, began treating Ms. Schaefer in the Spring of 2001, he opined that she had a 50–60 percent chance of surviving her cancer. Based on this evidence, the Circuit

involves a determination of causation in fact, which is "concerned with the ... fundamental ... inquiry of whether a defendant's conduct *actually* produced an injury." *Peterson v. Underwood,* 258 Md. 9, 16–17, 264 A.2d 851, 855 (1970). A plaintiff produces proof of causation legally sufficient to overcome summary judgment when the plaintiff shows that it is more probable than not that the defendant's negligence caused the alleged injury. *Id.* Taking into consideration the affidavits of Drs. Hutchins and Shmookler, the evidence of this case, when viewed in a light most favorable to the Marcantonios, raises genuine issues of material fact regarding causation.

■ In addition, we agree with the Marcantonios and with the Court of Special Appeals and conclude that this case does not involve the issue of "loss of chance" as that doctrine is defined by Maryland law. "Loss of chance" of survival refers to "decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the preexisting disease or injury, prior to any alleged negligent treatment, was improbable, i.e., 50% or less." *Fennell v. Southern Maryland Hosp.,* 320 Md. 776, 781, 580 A.2d 206, 208 (1990). On the basis of the record before us, the evidence indicates that Ms. Schaefer had an alleged 80 percent chance of survival prior to The Medical Providers' alleged negligence. Because Ms. Schaefer's alleged chance of survival exceeded 50 percent, the loss of chance doctrine is inapplicable to the Marcantonios' claims.[17]

Moreover, this Court declines the Marcantonios' invitation to revisit our decision in *Weimer v. Hetrick,* 309 Md. 536, 525 A.2d 643 (1987), where we held that Maryland does not recognize the loss of chance doctrine in claims brought under

---

Court and the Court of Special Appeals concluded that the Marcantonios could not establish proximate causation because The Medical Providers' alleged negligence deprived Ms. Schaefer of, at most, a 30 percent chance of survival.

17. Although the Marcantonios do not allege a loss of chance claim in their complaint, The Medical Providers referred to the claim as one involving loss of chance at the summary judgment hearing and the Circuit Court also characterized the claim in that manner.

the Maryland wrongful death statute, as codified under Md. Code (1974, 2006 Repl. Vol.), § 3–902(a) and 3–904(a) of the Courts & Judicial Proceedings Article. In *Weimer*, we concluded that the Maryland wrongful death statute requires a plaintiff seeking to recover damages under the statute to prove, by a preponderance of the evidence, that the defendant's negligence proximately caused the decedent's death. 309 Md. at 554, 525 A.2d at 652. Accordingly, we held that wrongful death claims where the defendant's alleged negligence deprived the plaintiff of less than a (50 percent) probable chance of survival are not compensable under Maryland law.

■ We are not persuaded that this is the proper case to reconsider our decision in *Weimer*. Specifically, the Marcantonios did not argue in the trial court or the Court of Special Appeals that Maryland law should be changed to allow recovery for loss of chance in wrongful death claims. In addition, the facts as alleged do not support a loss of chance claim. Therefore, the issue is not properly before the Court.[18]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. RESPONDENTS TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

HARRELL and WILNER, JJ., Concur.

---

18. Moreover, we note that the legislature has not amended the wrongful death statute since our decision in *Weimer* and that under the principle of *stare decisis* the Court acts in a "constrained manner" when overruling precedent so as to ensure "stability and integrity in the law." *Livesay v. Baltimore County*, 384 Md. 1, 15, 862 A.2d 33, 41 (2004) (quoting *McMellon v. United States*, 387 F.3d 329, 355 (4th Cir.2004)); *See also IBP, Inc. v. Alvarez*, 546 U.S. 21, 32, 126 S.Ct. 514, 523, 163 L.Ed.2d 288 (2005) ("Considerations of stare decisis are particularly forceful in the area of statutory construction...."); *State v. Wiegmann*, 350 Md. 585, 604, 714 A.2d 841, 850 (1998) (citations omitted) ("Under the principles of *stare decisis*, "for reasons of certainty and stability, changes in decisional doctrine ordinarily should be left to the Legislature.").

Concurring Opinion by WILNER, J., which HARRELL, J., Joins.

I concur in the judgment, principally because I accept the Court's assessment that there was not the kind of contradiction between the deposition testimony and later affidavit of Dr. Hutchins to warrant the striking of the affidavit under Md. Rule 2–501(e). There clearly *was* a contradiction of sorts—in deposition, he said he would not be offering an opinion as to causation and in his affidavit he *did* offer such an opinion—but I agree that it was not the kind of contradiction of fact that Rule 2–501(e) was designed to address. I therefore agree that it was error for the trial court to strike his affidavit and, having struck it, then to grant summary judgment on the ground that there was no legally sufficient evidence of causation.

I write separately only to note that, although the striking of Hutchins's affidavit cannot be justified by Rule 2–501(e), which was the only basis upon which it *was* stricken, there was clearly another ground upon which, had it been argued, the court could, and probably should, have done what it did.

The initial complaint in this case was filed in November, 2004. Ms. Schaefer was still alive at the time, and so, other than a loss of consortium claim by her husband, Marcantonio, the complaint was solely to recover for the personal injuries and expenses incurred by Ms. Schaefer arising from the spread of the cancer—the pain, the additional medical procedures and expenses. Ms. Schaefer died in May, 2005, and, in November of that year, an amended complaint was filed to add a wrongful death claim. Pursuant to a scheduling order entered in July, 2005, a great deal of discovery had already taken place. Dr. Shmookler's deposition was taken in December, 2005, after the amended complaint had been filed and cause of death first became an issue. Dr. Hutchins's deposition occurred in January, 2006. Based on those depositions, the defendants had every right to believe that (1) Dr. Hutchins would not be rendering an opinion as to the cause of Ms. Schaefer's death, because that is what he said, and (2) Dr.

Shmookler did not have an opinion as to what Ms. Schaefer's "staging" was in July, 2001 or her prognosis of survivability in May, 2001, because that is what *he* said.

In February, 2006, an amended scheduling order was entered. It required all depositions to be completed by March 23, 2006. On March 23, 2006, a pretrial order was entered, stating that, except for the plaintiff's deposition of a defense expert, no further discovery was allowed, that all dispositive motions had to be filed by June 1, 2006, and that a hearing on any such motion would occur on July 27, 2006.

In conformance with that order, the motion for summary judgment was filed on June 1, 2006, the basis of it being that the plaintiff had failed to show that Ms. Schaefer's death was proximately caused by the negligence of the defendants. The two affidavits at issue here were attached to the defendant's answer to the motion, which was filed on July 13, 2006. So far as we have been apprised, no prior notice of the new opinions of Drs. Hutchins and Shmookler was given to the defendants.

In terms of how this case was presented and argued, those affidavits decisively changed the legal landscape before the Circuit Court. That court held that, without the affidavits, the plaintiff had failed to establish the proximate cause of Ms. Schaefer's death and therefore had failed to establish their cause of action.[1] With the affidavits, a sufficient case *has* been made to avoid summary judgment. The problem, of course, was that, with discovery having been closed four months earlier and with the defendants reasonably believing that Dr. Hutchins would not be offering an opinion as to causation, the defendants were essentially ambushed two weeks before the hearing on their motion, without any explanation and without any ability, prior to the hearing, to conduct further discovery as to the basis for Hutchins's new opinion.

1. Although I question whether that is so, at least with respect to Count I of the amended complaint (the survival action on behalf of Ms. Schaefer), that ruling is not, and does not need to be, addressed in this Court's opinion.

That kind of practice is exactly what scheduling and discovery orders are designed to prevent. The belated offering of new opinions from previously deposed experts is no different than a party—plaintiff or defendant—coming up with new experts after discovery has been closed. That kind of evidence can properly be excluded at trial, and there is no reason why it may not be excluded in the context of a summary judgment motion. This is not a matter of unwarranted adherence to some technical rules. It is a matter of basic fairness and of assuring that litigation is pursued in an efficient and professional manner.

Unfortunately, this ground was not raised, and the Circuit Court did not consider it. I hope, however, that this Court's opinion will not be regarded as precluding the striking of evidence presented in the manner done in this case. I am authorized to state that Judge

HARRELL joins in this concurring opinion.