*Willie James Barton, Jr. et al. v. Advanced Radiology P.A., et al.*, No. 1336, September Term 2019. Opinion by Wells, J.

**CIVIL LAW – MEDICAL MALPRACTICE – "LOSS OF CHANCE"**

Appellants argue that the trial court inappropriately applied the theory of "loss of chance" when it granted appellees' motion for judgment notwithstanding the verdict (JNOV) under Rule 2-532.

**CIVIL LAW – MEDICAL MALPRACTICE – "LOSS OF CHANCE"**

The Court of Special Appeals held that "loss of chance" remains unavailable as a tort cause of action in Maryland.

**CIVIL LAW – MEDICAL MALPRACTICE – "LOSS OF CHANCE"**

Although the trial court used terms like "chance of survival" and "loss of survival" when it granted appellees' motion JNOV, the court properly considered whether appellants had proven that appellees' negligence was a proximate cause of the decedent's death, rather than engage in a "loss of chance" analysis.

**CIVIL PROCEDURE – MOTION NOTWITHSTANDING THE VERDICT – APPELLELATE STANDARD**

A trial court's decision to grant a motion JNOV shall be reviewed assuming the truth of all credible evidence on the issue, and all inferences that may be fairly deduced therefrom in the light most favorable to the nonmoving party. The amount of legally sufficient evidence needed to create a jury question is slight. Thus, if the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the JNOV should be denied.

**CIVIL PROCEDURE – MOTION NOTWITHSTANDING THE VERDICT – APPELLELATE STANDARD**

Appellees focused on one part of appellants' causation expert's testimony in persuading the trial court to grant JNOV in their favor. On review, we take the whole of the expert's testimony into account and all inferences that may be fairly deduced therefrom in the light most favorable to the appellants, the nonmoving party. We conclude that the testimony produced the "slight" evidence needed to permit the jury to resolve any conflicts in the evidence. Consequently, the trial court abused its discretion in granting appellees' motion JNOV.

Circuit Court for Baltimore County
Case No. 03-C-18-002119

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1336

September Term, 2019

_____

WILLIE JAMES BARTON, JR., ET AL.

v.

ADVANCED RADIOLOGY P.A., ET AL.
_____

Reed,
Wells,
Zarnoch, Robert A.,
        (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Wells, J.
_____

Filed: November 23, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Appellants, Charles Burton, individually and as personal representative of his wife,[1] Lana Burton's estate, Larae Burton McClurkin, Willie Barton, and the Estate of Melba Barton appeal from an order in which the Circuit Court for Baltimore County granted appellees, Advanced Radiology, P.A. and Dr. Sanford Minkin, judgment notwithstanding the verdict. A jury found that appellees breached the standard of care in the treatment of Lana Burton and that this breach was a cause of her death. The jury awarded $282,529.00 in non-economic damages to the Estate of Lana Burton, $300,000.00 to her husband, Charles Burton "for the loss of financial support as well as the replacement value of the services that she furnished or probably would have furnished," and $2 million in non-economic damages to Larae Burton McClurkin, her daughter.

The trial court granted the appellees judgment notwithstanding the verdict, finding that the appellants failed to prove that Dr. Minkin's breach of the standard of care was the proximate cause of Lana Burton's death. Specifically, the court found that appellants' causation expert established that Ms. Burton had a greater than fifty percent probability of survival even if one assumed that Dr. Minkin failed to timely diagnose her with breast cancer.

---

[1] In the Burtons' Second Amended Complaint Charles Burton is listed as personal representative of the estate of his late wife, Lana Burton. On the caption of the Burtons' brief, and elsewhere, Larae Burton McClurkin is listed as Ms. Burton's personal representative. It was nowhere obvious when the personal representative of Ms. Burton's estate had changed, if in fact it had.

This appeal followed.  Appellants present three questions for our consideration, which we have condensed and rephrased[2]:

I.      Did the trial court err in granting the appellees' motion for judgment notwithstanding the verdict?

II.     Did the trial court abuse its discretion in limiting Dr. Pushkas' testimony regarding his use of a website's survivability algorithm?

We hold that the circuit court erroneously found that appellants failed to show appellees' negligence was a proximate cause of Ms. Burton's death.  Consequently, the trial court abused its discretion in granting appellees' judgment notwithstanding the verdict.  Because we reverse the trial court's entry of judgment in appellees' favor and reinstate the jury's verdict and award, we decline to address the second issue.

### FACTUAL AND PROCEDURAL BACKGROUND

Charles Burton, individually and as the personal representative of the Estate of Lana Burton, Larae Burton McClurkin, Willie James Barton, Jr., and Melba Ann Barton[3] sued

---

[2] Appellants' verbatim questions are:

1.  Did the trial court err by misapplying the loss of chance doctrine when evidence presented was that Lana Burton's chances of survival at the time of the malpractice were over 80%; fell to lower than 50% at the time of diagnosis; and she died from metastatic breast cancer?

2. Did the trial court err in granting Appellees' Motion for Judgment Notwithstanding the Verdict by setting aside the jury's verdict and giving preference to Appellees' characterization of the evidence?

3. Did the trial court [err] when it precluded Appellants' expert from utilizing a reasonably reliable authority?

[3]  Ms. Burton's maiden name was "Barton."

Advanced Radiology, P.A., Advanced Radiology, LLC, and Dr. Sanford Minkin, alleging that Dr. Minkin failed to properly diagnose Lana Burton (hereafter, "Ms. Burton") for Stage I breast cancer, which later spread to other parts of her body and, sadly, led to her death on February 17, 2016. Charles Burton is Ms. Burton's husband. Larae McClurkin is Ms. Burton's daughter. Willie Barton is Ms. Burton's father. Melba is Ms. Burton's mother.[4] (Hereafter, the appellants will be referred to collectively as "the Burtons.")

### A. Ms. Burton's Breast Cancer Diagnosis and Treatment

In November 2011, Ms. Burton underwent a routine breast cancer examination at Advanced Radiology. The results of that examination indicated she had no abnormalities. Roughly six months later, May 11, 2012, Ms. Burton found a lump in her right breast and returned to Advanced Radiology. They performed a mammogram and an ultrasound examination. Dr. Minkin, a radiologist, prepared a report that described the lump as both "normal glandular tissue" and that it was "benign."

One year and three months later, August 9, 2013, Ms. Burton returned to Advanced Radiology for a follow-up examination. A mammogram and ultrasound showed abnormalities that were "highly suspicious for extensive malignancy in the right breast centrally and in the lower outer quadrant [of the right breast] with malignant adenopathy." The following month, Ms. Burton underwent a biopsy that revealed that she did, in fact, have Stage III, "triple negative" breast cancer, in the abnormal areas identified from the

---

[4] Apparently, Melba Barton passed away sometime after the filing of the second amended complaint. There, she is named as Ms. Burton's "surviving" mother. The verdict sheet, however, notes "the Estate of Melba Barton" as one of the plaintiffs.

previous month's exams. Ms. Burton immediately began chemotherapy and radiation treatments, which she continued for more than two years. Unfortunately, the cancer had spread to her neck, liver, and her lungs. Because the cancer had become pervasive, Ms. Burton stopped receiving chemical and radiation treatments. She died on February 17, 2016 at the age of 56.

The Burtons sued Dr. Minkin and Advanced Radiology (hereafter, "the healthcare providers") advancing four theories of liability, each in a separate count: I. Survival Action – Negligence, II. Survival Action – Informed Consent, III. Survival Action – Loss of Consortium, and IV. Wrongful Death under Maryland Code Annotated, (1974, 2013 Repl. Vol.) Courts and Judicial Proceedings Article, §§ 3-901 through 3-904.

**B**. **The Trial**

The case was tried before a jury in the Circuit Court for Baltimore County over ten days: June 10-20, 2019. We summarize the competing versions of fact and opinion surrounding Ms. Burton's care.

**1. Plaintiffs' Case**

At trial, the Burtons called two expert witnesses in support of their theories of liability. The first, Dr. Rebecca Zuurbier, a radiologist, testified as an expert witness on the standard of care. She opined that all of Ms. Burton's mammograms before May 11, 2012 indicated that she had no abnormalities. But, Dr. Zuurbier testified that the May 11th mammogram's images revealed a grape-sized mass in Ms. Burton's right breast. Dr. Zuurbier noted that Dr. Minkin did not perform a biopsy of the lump. He only performed a mammogram and an ultrasound. In Dr. Zuurbier's opinion, Dr. Minkin's failure to

4

perform a biopsy on a mass the size of the lump in Ms. Burton's breast fell below the standard of care, even though both the mammogram and the ultrasound did not indicate that cancer was present.

The second expert, Dr. Gabriel Pushkas, an oncologist and hematologist at Johns Hopkins Medicine, Suburban Hospital, testified as the Burtons' causation expert. Based on the imaging from Ms. Burton's medical examinations that Dr. Minkin performed at Advanced Radiology, Dr. Pushkas opined that she had Stage I cancer in May 11, 2012. But, eighteen months later, when she returned to Advanced Radiology on August 9, 2013, the tumor had grown, and she was diagnosed with "triple negative" Stage III breast cancer. Dr. Pushkas explained Stage III this way:

> If the tumor gets so large that it is even larger than two inches, then the chances of lymph nodes being involved is fairly high. Not only that, but usually with cancer like this we would have small areas of involvement elsewhere in the body and then we're talking about a Stage 3 breast cancer. Also, if this cancer has already gotten – even though it is not quite as big as I just told you, but it is already involving part of the chest wall so that you cannot remove it by surgery alone, then it is Stage 3 disease.

Dr. Pushkas used an analogy of an intruder in a house to explain what "triple negative" breast cancer is. "[The] cancer is hiding in a room behind a locked door and it is growing in there and eventually it is going to destroy the whole house." Dr. Pushkas continued:

> We have three keys. If we have the keyholes, we can open the door with these three keys and destroy the cancer before it destroys the patient. If there are no keyholes on the door, somebody locked the door and just pasted over the holes, we cannot use any of the treatments that we have against cancers that would have the keyholes. That severely limits our ability to treat the cancer and kill the cancer with any chemotherapy. We do have chemotherapy, but it is not as effective and it is much rougher than the ones up here. So, in a case like this, it is particularly important that we get to the cancer early before it gets to the point where we cannot control it anymore

5

because our chemotherapy is not that good for triple-negative breast cancer. Other portions of Dr. Pushkas' testimony play a central role in this appeal and will be discussed in greater detail in the following section.

### 2. Defendants' Case

The healthcare providers' presentation began with a videotaped deposition of Dr. Minkin. Several excerpts from Dr. Minkin's deposition testimony were read into the record. Later, Dr. Minkin testified in-person. After discussing his credentials, he described for the jury how one would perform a mammogram reading, and what he would look for to detect abnormalities. The study he did of Ms. Burton's right breast on May 11, 2012, to his eye, showed "a moderate amount of fibroglandular tissue with no focal masses, no evidence of architectural distortion, malignant like or calcifications…." In other words, there was nothing remarkable about Ms. Burton's breast tissue that was inconsistent with her mammograms from 2008 to that point. That is why, he explained, he only did an ultrasound after the mammograph and not a biopsy. The results of the ultrasound that he ordered did not alarm him. The ultrasound encompassed several different views of Ms. Burton's right breast. Although the imaging showed some darker and lighter areas of breast tissue where Ms. Burton felt a lump, in his opinion the mass was "either normal glandular tissue or a fat lobule, or there [was] no mass." In short, he did not conclude that the areas on the May 11, 2012 ultrasound merited a biopsy.

Dr. Peter Kaufman, an oncologist, testified on behalf of the healthcare providers on the standard of care. In Dr. Kaufman's opinion, any delay in Dr. Minkin's diagnosis of Ms. Burton's breast cancer had no effect on the ultimate outcome of her case.

Sure, so [Ms. Burton] unfortunately was diagnosed with triple -- that we term as triple-negative breast cancer. So this is a type of breast cancer that is known to have a poor prognosis. In her case particularly, she had an unusually rapid course. So, from the time she was diagnosed, which was August or September of 2013 -- well, let me phrase it another way. She was diagnosed at that time, and then underwent very appropriate, very reasonable and appropriate standard treatment, mastectomy, chemotherapy and radiation therapy, and unfortunately recurred without a, I should say, developed metastatic disease unusually rapidly after the completion of her treatment, and she received state of the art treatment.

Dr. Julia Flukinger, a radiologist, and Dr. David Hicks, a pathologist, testified as experts for the defense. Dr. Flukinger testified about the mammography images that were generated for Ms. Burton. She said that she did not do a "spot compression" of Ms. Burton's breast during the May 11, 2012 examination, because she was "fairly certain that [if] there were real findings that [she] would be able to find [it] with ultrasound." She did not think a biopsy was necessary. Dr. Flukinger also produced the images from Ms. Burton's September 2013 exam and noted several masses in Ms. Burton's breast from the "6:00 to the 8:00" positions. She noted that there were also "highly suspicious findings" in Ms. Burton's lymph nodes.

The healthcare providers offered Dr. Hicks as their causation expert. Dr. Hicks reviewed the biopsy from Ms. Burton's August 2013 examination, and prepared slides from that tissue. In his opinion, those images showed "actively proliferating" tumor cells in the breast which is a feature "of an aggressive breast cancer." "We are dealing with a high-grade invasive carcinoma." The tumor was large and rapidly growing. With another slide, Dr. Hicks noted that the cancerous growth had spread to Ms. Burton's lymph nodes. In Dr. Hicks' opinion, this tumor was not present before 2013. The doctor explained that

7

Ms. Burton, unfortunately, had a "triple negative" form of breast cancer, "and [because of] their aggressive growth and their ability to spread early, I think that more likely than not it would have been present as micro-metastatic disease." In other words, the cancer was so small that it was undetectable in May 11, 2012. And as for the lump that Ms. Burton felt in 2012, Dr. Hicks testified that the lump "subsequent[ly] grew and changed. And so I think that more likely than not there was tumor present in May of 2012 and we saw it manifest as an abnormal lymph node with metastatic disease."

### 3. Healthcare Providers' Motion for Judgment

At the conclusion of the presentation of all the evidence, the healthcare providers moved for judgment. The focus of their argument was that Dr. Pushkas' testimony was that if Dr. Minkin had diagnosed Ms. Burton with cancer in May 11, 2012, she would have had "an 80% chance of 5[-]year survival." Fifteen months later, after she was diagnosed and had started treatment, Dr. Pushkas estimated that Ms. Burton had a 66% chance of survival. In other words, the defense claimed that Dr. Pushkas did not opine that the healthcare providers' negligence was the probable cause of Ms. Burton's death, because she had a 66% probability of survival even after the cancer was discovered.

As might be expected, the Burtons argued just as strenuously that Dr. Pushkas' testimony had established causation. In short, they argued, "In this case there was no question that Ms. Burton would have survived had she been diagnosed in May of 2012."

8

At the end of counsels' arguments, the court reserved a decision on the defense's motion for judgment under Rule 2-519(d).[5]

### 4. The Verdict

The jury found in favor of the Burtons and awarded $282,529.00 in non-economic damages to the Estate of Lana Burton, $300,000.00 to Charles Burton, Ms. Burton's husband, and $2 million in non-economic damages to her daughter, Larae Burton McClurkin. The jury declined to award damages to Ms. Burton's father, Willie Barton, or the estate of her mother, Melba Barton.

### 5. Motion for Judgment Notwithstanding the Verdict

After the verdict, the healthcare providers immediately filed post-trial motions, including a motion for judgment notwithstanding the verdict. Essentially, the motion reiterated in greater detail what they had argued in the motion for judgment. They argued that Dr. Pushkas said that in 2013, when Ms. Burton was diagnosed with cancer, she had a better than 50% probability of surviving five years, even if one assumed that Dr. Minkin misdiagnosed her in 2012.

The Burtons argued that the jury evaluated the totality of the evidence and found in their favor. In other words, they argued that Dr. Pushkas' testimony, taken with the other

---

[5] Maryland Rule 2-519(d), Reservation of Decision in Jury Cases, states:
    In a jury trial, if a motion for judgment is made at the close of all the evidence, the court may submit the case to the jury and reserve its decision on the motion until after the verdict or discharge of the jury. For the purpose of appeal, the reservation constitutes a denial of the motion unless a judgment notwithstanding the verdict has been entered.

evidence, showed that Ms. Burton's cancer should have been caught in 2012. It was not. As a result, she met an untimely death.

After counsels' arguments, the court ruled from the bench and granted the healthcare providers' motion. As will be discussed in greater detail, the trial judge agreed with the healthcare providers that Dr. Pushkas failed to establish that Dr. Minkin's alleged negligence was a proximate cause of Ms. Burton's death.

The Burtons filed a timely appeal. Additional facts may be introduced, as needed.

## DISCUSSION

### I. The Trial Court Improperly Granted Judgment Notwithstanding the Verdict

#### A. Standard of Review

Maryland Rule 2-532(a) permits a party to move for judgment after a jury has rendered a verdict, but "only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Generally, the motion must be "filed within ten days after entry of judgment on the verdict." Rule 2-532(b) (Hereafter, "motion JNOV").

"An appellate court reviews the circuit court's decision to allow or deny . . . [a Judgment Notwithstanding the Verdict] to determine whether it was legally correct." *Retina Group of Washington, P.C. v. Crosetto*, 237 Md. App. 150, 174 (2018) (quoting *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011)). "We assume the truth of all credible evidence on the issue, and all fairly deducible inferences therefrom, in the light most favorable to the party against whom the motion is made," which, in this case, are the

10

Burtons. *Orwick v. Moldawer*, 150 Md. App. 528, 531-32 (2003). The evidence legally supports a claim if any reasonable fact finder could find the existence of the cause of action by a preponderance of the evidence. *Barnes v. Greater Baltimore Medical Center, Inc.*, 210 Md. App. 457, 480 (2013). "In a jury trial, the amount of legally sufficient evidence needed to create a jury question is slight." *Id.* (citing *Hoffman v. Stamper*, 385 Md. 1, 16 (2005)). Thus, if the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the JNOV should be denied. *Aronson & Co. v. Fetridge*, 181 Md. App. 650, 664 (2008) (internal quotation marks omitted).

**B**. **The Trial Court Did Not Employ the "Loss of Chance" Theory When Rendering its Motion JNOV Ruling**

Before we address the substantive issue at the center of this appeal -- proximate cause -- we must first examine the concept of "loss of chance." The Burtons argue that when the trial judge granted the motion JNOV, he erroneously applied the principles of "loss of chance," which Maryland courts have not recognized as a viable tort theory. According to the Burtons, the healthcare providers argued to the trial court that,

> (a) the decedent had an 80% chance of five-year survival prior to the defendants' proven negligence; (b) the [decedent's] chance of survival at the time of diagnosis was greater than 50% and (c) the decedent in fact died within five years of the defendants' negligence.

The Burtons claim this syllogism amounts to a loss of chance argument. The healthcare providers assert that the trial court did not apply or misapply the loss of chance theory. They claim that the trial court correctly found that the Burtons simply failed to establish causation consistent with well-established common law principles and the holding in *Weimer v. Hetrick*, 309 Md. 536 (1987).

11

**C. Competing Tort Theories: Loss of Chance and Proximate Cause**

We acknowledge that questions of probability that arise when analyzing concepts like "loss of chance" and "more likely than not" can be confusing. Because each concept embraces a 50% threshold of proof, both concepts seem to be different sides of the same coin. They are not.

"Loss of chance," sometimes, perhaps more aptly called "loss of *a* chance,"[6] is a tort theory that permits recovery for avoiding some adverse result or of achieving a more favorable result. The idea is that "a chance" has some inherent value; a tortious deprivation of such an opportunity should trigger liability.[7] The Court of Appeals has called loss of chance simply a "diminished prospect for a better result." *Goldberg v. Boone*, 396 Md. 94 (2006).

The theory has found application in various settings, such as in employment law, where loss of an opportunity for promotions due to discriminatory behavior has been deemed compensable. *See, Doll v. Brown*, 75 F.3d 1200, 1206 (7th Cir. 1996) (finding that the theory of loss of chance is "peculiarly appropriate in employment cases involving competitive promotion," but refusing to hold that the theory was applicable to the case because the issue had not been briefed by the parties). The theory has also been applied in contract actions, where a plaintiff may recover for lost profits due to a breach of contract.

---

[6] Reisig, Robert A., Jr., *The Loss of a Chance Theory in Medical Malpractice Cases: An Overview*, 13 Am. J. Trial Advoc. 1163 (1990).

[7] Some courts have viewed loss of chance as a theory of *causation* rather than a separate theory of *injury*. *See e.g., Mandros v. Prescod*, 948 A.2d 304, 310 (R.I. 2008) (holding that the theory of loss of chance is an alternative to conventional notions of causation).

*See, Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 29 (Fla. Dist. Ct. App. 1990) (finding that it is now an "accepted principle of contract law that recovery will be allowed where a plaintiff has been deprived of an opportunity or chance to gain an award or profit even where damages are uncertain").

But perhaps the widest application of loss of chance has been in the field of medical malpractice. *See, e.g., Matsuyama v. Birnbaum,* 890 N.E.2d 819 (Mass. 2008); *DeBurkarte v. Louvar*, 393 N.W.2d 11, 135 (Iowa 1986); *Kallenberg v. Beth Israel Hospital*, 357 N.Y.S.2d 508 (N.Y. App. Div. 1974), *aff'd*, 337 N.E.2d 128 (1975).

*Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966), was the first medical malpractice case to adopt loss of chance as a basis for recovery. There, a husband brought his diabetic wife to the Little Creek, Virginia, Amphibious Naval Base dispensary because she was suffering from intense abdominal pain. *Id.* at 628. After a ten-minute examination, a doctor sent the woman home with pain-relief medication, told her she had a "bug," and asked her to return in eight hours. *Id.* Soon after returning home, she died of what was later found to be an intestinal obstruction. *Id.* at 629. The Fourth Circuit held that because the uncontradicted expert testimony was that with proper diagnosis and prompt surgery the plaintiff would have survived, it necessarily followed that the doctor's negligence prevented whatever chance of recovery she might have had and, therefore, was the proximate cause of her death. *Id.* at 633. Jurisdictions that have adopted loss of chance most often quote the following passage from *Hicks* to explain why they found favor with the theory:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.

*Id*. at 632.

In his widely cited note, "*Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981), Joseph H. King, Jr. noted that the "loss of chance" theory encompasses two distinct categories of complaints, the first of which is "definitive loss." King explains that,

a definitive loss . . . involves the loss of a chance either of completely avoiding a specific harm or of achieving a fairly definitive favorable result. These types of claims include both materialized losses and anticipated future consequences (including loss of future benefits). A plaintiff might assert, for example, that had the decedent received timely treatment, he would not have died from the disease.

*Id*. at 1364. King states that, "[t]he second category involves 'partial or less definitive losses,' *id*., and typically involves claims that the tort 'aggravated a preexisting condition, delayed its cure, failed to slow its progress, accelerated the onset of harm, or will have such effects in the future.'" *Id*. at 1373. "Therefore, even though the patient cannot recover for the preexisting condition, he can recover for negligent acts further exacerbating the condition." *Id*.

King questioned the ability of the traditional negligence concept of proximate cause to properly compensate a plaintiff for a defendant-physician's failure to make a timely diagnosis. He uses the following example to illustrate his point:

> [C]onsider the case in which a doctor negligently fails to diagnose a patient's cancerous condition until it has become inoperable. Assume further that even with a timely diagnosis the patient would have had only a thirty percent chance of recovering from the disease and surviving over the long term. There are two ways of handling such a case.
>
> **Under the traditional approach, this loss of a not-better-than-even chance of recovering from the cancer would not be compensable because it did not appear more likely that (sic) not that the patient would have survived with proper care.** Recoverable damages, if any, would depend on the extent to which it appeared that cancer killed the patient sooner than it would have with timely diagnosis and treatment, and on the extent to which the delay in diagnosis aggravated the patient's condition, such as by causing additional pain.
>
> **A more rational approach, however, would allow recovery for the loss of the chance of cure even though the chance was not better than even. The probability of long-term survival would be reflected in the amount of damages awarded for the loss of the chance.** While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant's negligence, he could show by a preponderance that he was deprived of a thirty percent chance of a cure.

*Id*. at 1363-64 (paragraph breaks added for ease of reading with emphasis supplied). Note the difference between a traditional proximate causation analysis and the theory of loss of chance. *See also Goldberg*, 396 Md. at 128-29, citing a similar scenario taken from Stephen F. Brennwald's, *Community Proving Causation In "Loss of a Chance" Cases: A Proportional Approach*, 34 Cath. U.L. Rev. 747, 749-51 (1985).

### D. Maryland's Loss of Chance Jurisprudence

Maryland falls squarely among the jurisdictions that do not recognize loss of chance as a theory of tort recovery in medical malpractice cases. Three cases establish this fact.

15

In *Fennell v. Southern Maryland Hospital Center, Inc*., 320 Md. 776 (1990), the Court of Appeals declined to permit recovery for alleged medical negligence based on loss of chance in survivor actions. The family of Cora Fennell filed a medical malpractice claim against Southern Maryland Hospital ('the hospital") alleging that doctors there failed to diagnose Ms. Fennell with an acute case of meningitis after her husband brought her to the emergency room complaining of a severe headache. *Id*. at 779. Responding to the hospital's motion for summary judgment, the Fennells filed an affidavit of an infectious disease expert who opined that even if Ms. Fennell had been diagnosed and treated with the appropriate standard of care, her chance of survival was 40%. *Id*. at 780. In other words, because the doctors failed to provide Ms. Fennell with immediate care, she lost her 40% chance of survival.

While Ms. Fennell's case was in litigation, the Court decided *Weimer v. Hetrick*, previously cited, a medical malpractice case involving an obstetrician, Dr. Weimer, among others, whose alleged negligence during a caesarean delivery led to the death of the Hetrick's infant son, Jason. 309 Md. at 539-39. In rejecting a theory of liability that focused on depriving the infant of substantial possibility of survival, the Court held that the Hetricks were required to show that Dr. Weimer was negligent, and his negligence was the proximate cause of the child's death to recover under wrongful death statute. *Id*. at 554. The Court held that the "more likely than not standard" was to be used when evaluating wrongful death claims, stating, "[i]t is crystal clear that determination of such questions [applicability of loss of chance] is impermissible in an action for wrongful death

16

under the Maryland statute," adding that, "there is no room for judicial interpretation" on this issue. *Weimer*, 309 Md. at 554.

Nonetheless, the Fennells argued whether *survival* actions were covered by the same standard was an open question. *Fennell*, 320 Md. at 781. Recognizing that other jurisdictions had adopted it as a cause of action, the Court of Appeals put to rest speculation that Maryland would adopt "loss of chance" in survivor lawsuits answering the question in the negative. The Court denied the request, concluding that the creation of a new cause of action entailed significant societal costs that "are more properly resolved by the legislature."

> Recognition of loss of chance damages would allow a new form of damages as well as allow medical malpractice claims by an entirely new class of plaintiffs who traditionally have had no cause of action at common law. Patients whose chances of surviving their pre-existing injuries or diseases were 50% or less had no cause of action for negligent treatment under traditional tort principles. Although their chances of survival were decreased, survival was unlikely; and therefore, actual demonstrable harm, in all probability, did not occur. Recognition of this new form of medical malpractice damages for loss of a chance would undoubtedly cause an increase in medical malpractice litigation, as well as result in an increase in medical malpractice insurance costs.

*Id*. at 792. "Consequently, we are not persuaded that the benefits of allowing loss of chance damages in a survival action offset the detriments of a probable increase in medical malpractice litigation and malpractice insurance costs." *Id*. at 794.

The last time the Court of Appeals addressed issues of loss of chance was in *Marcantonio v. Moen*, 406 Md. 395 (2008). The chief issues concerned a pair of allegedly contradictory medical affidavits. The Court of Appeals held that the circuit court improperly struck the affidavits, which formed the basis for summary judgment in favor of

17

a gynecologist sued under the wrongful death statute for allegedly failing to diagnose a mass on the plaintiff's right ovary, from which the patient later died. 406 Md. at 398. In depositions, the deceased patient's expert witness testified,

> My opinion is that in response to abnormal bleeding Dr. Moen was required to do an endometrial biopsy as soon as is possible. The longer you wait, the *more likely the patient is to suffer the consequences of the delay*. And the whole time period from the 25th of August until ultimately the biopsy was done, in that whole time period, I guess we would have to say until Dr. Moen did it, she was in breach of the standard of care.

406 Md. at 399-400 (emphasis added). The opinion paraphrased the expert witness deposition testimony regarding the patient's chance of survival when it said that if the "condition had been properly diagnosed and treated in August or September of 2000, *she would have had an 80% chance of survival*." 406 Md. at 400 (emphasis added). The same expert testified in a separate, subsequently filed affidavit that Dr. Moen's failure to make the appropriate diagnosis was the proximate cause of the patient's death. *Id.*

The plaintiff's other causation expert testified in a deposition that if the mass had been properly identified, "the cancer would have been curable." *Id*. at 402. That same expert said in a later affidavit, "the failure to properly evaluate the ovarian tumor . . . when it was in an early stage, was a substantial factor in proximately causing her death." *Id*. at 402.

After the circuit court struck the affidavits, it found that the remaining evidence showed the decedent's family failed to "establish proximate causation of 51 percent or more of the chance of loss of survival." *Id*. at 403. The Court of Appeals disagreed concluding that the "affidavits . . . do not materially contradict their respective deposition

testimony within the meaning of Rule 2-501(e)." 406 Md. at 410. The statements were not "irreconcilable statements of material fact." *Id*. at 412.

Significantly, on the issue of causation, the Court concluded "that this case does not involve the issue of 'loss of chance' as that doctrine is defined by Maryland law." *Id*. at 415. Declining to revisit the holding in *Weimer*, "where we held that Maryland does not recognize the loss of chance doctrine in claims brought under the Maryland wrongful death statute," the Court noted that,

> "Loss of chance" of survival refers to "decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the preexisting disease or injury, prior to any alleged negligent treatment, was improbable, i.e., 50% or less." On the basis of the record before us, the evidence indicates that Ms. Schaefer had an alleged 80 percent chance of survival prior to The Medical Providers' alleged negligence. Because Ms. Schaefer's alleged chance of survival exceeded 50 percent, the loss of chance doctrine is inapplicable to the Marcantonios' claims.

*Id*. (citing *Fennell*, 320 Md. at 781).

We conclude that unless and until the Court of Appeals announces a significant revision of its holdings in *Weimer* or *Fennell*, loss of chance remains unavailable as a cause of action in medical malpractice wrongful death and survival claims. From our readings of the cases, we emphasize that loss of chance is a theory of tort recovery and should not be considered an alternative or "shortcut" to the well-established proof requirement of proximate cause.

### E. The Trial Court's Ruling

We now turn to what occurred in this case. When delivering its oral ruling on the healthcare providers' motion JNOV, the court discussed the holdings in *Weimer* and

19

*Marcantonio* and reviewed Dr. Pushkas' testimony. In reaching his conclusion to grant

the motion JNOV, the judge said:

> THE COURT: But there's no evidence that was presented that, in my view, supports the proposition that she had below a 50 percent chance of survival. And this is my - - **so I'm talking about proximate cause here**, **not loss of survival**, **just proximate cause**, and that it was at all times greater than 50 percent.
>
> And it was very clear to me that Dr. Pushkas was, he did not equivocate on that. He was very firm in his testimony when he was testifying and [defense counsel] was literally writing down what he said and projecting it on the wall for everyone to see.
>
> **So I do find that based on causation that the Plaintiffs have not met their burden** and that - - and I did reserve on the Motion for Judgment at the end of the entire case, so I do grant the Defendants' Motion for Judgment Notwithstanding the Verdict.

(emphasis added).

Putting aside the Burtons' claim that the healthcare providers have mischaracterized

Dr. Pushkas' testimony,[8] it seems to us that the healthcare providers have consistently

argued that Dr. Pushkas failed to establish causation. They have focused on what *caused*

her death, not whether Ms. Burton gained or lost an *outcome*.

After our review, we think the Burtons' argument that the judge considered loss of

chance in reaching his decision is misplaced. To be sure, this is not a loss of chance case

because the testimony that court considered at JNOV was that Ms. Burton' chance of

survival exceeded 50%. *Marcantonio*, 406 Md. at 415 ("Because [the decedent's] alleged

---

[8] In their brief, the Burtons claim that Dr. Pushkas did not say that Ms. Burton's chance of recovery was "greater than 50%." After reviewing the trial transcript, we note that at least at one point, Dr. Pushkas said that Stage III-A, triple negative patients like Ms. Burton had a sixty-six percent chance of survival over five years, after the cancer is diagnosed.

chance of survival exceeded 50 percent, the loss of chance doctrine is inapplicable to the [plaintiffs'] claims.") Although he used words like "chance of survival," and "loss of survival," we think the judge undertook a proximate cause analysis.

But while the judge engaged in a proximate cause analysis, we conclude that his focus was misdirected. The judge, concentrating on one part of Dr. Pushkas' testimony, found that even if it was presumed that Dr. Minkin was negligent, patients like Ms. Burton had a 66% chance of survival after diagnosis. The judge analyzed proximate cause in terms of the likelihood that Ms. Burton would die from cancer versus whether the healthcare providers' negligence proximately caused her death. As will be discussed in the next section of this opinion, the judge should have focused on whether the totality of the evidence was sufficient for the jury to find that Dr. Minkin's supposed failure to diagnose Ms. Burton's cancer was a proximate cause of her death.

## F. Proximate Cause

The Burtons' claim of medical malpractice is predicated on the familiar elements of negligence: duty, breach, causation, and harm. *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 330 (2012). "To prove causation, the [Burton's] had to establish that but for the negligence of the defendant[s], the injury would not have occurred." *Id*. at 481.

"Proximate cause," means that a plaintiff must prove with reasonable certainty, or that it is "more likely than not," that a defendant's negligence was a cause the plaintiff's injury. *See, Maryland Pattern Jury Instruction-Civil* 1:14 ("In order to prove something by a preponderance of the evidence, a party must prove it is more likely so than not so.") In *Weimer*, the Court of Appeals reiterated that reasonable "[p]robability exists when there

21

is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur)." *Weimer*, 309 Md. at 549-50 (quoting *Pierce v. Johns– Manville Sales Corp.*, 296 Md. 656, 666 (1983)) (emphasis omitted). "Mere possibility exists when the evidence is anything less." *Id.* (quoting *Davidson v. Miller*, 276 Md. 54, 62 (1975)).

In a negligence case, a plaintiff has two burdens: First, the threshold inquiry is whether a defendant's conduct produced an injury, or causation-in-fact. *Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 504 (2011); Restatement (Second) of Torts § 431 (1965). The second being the burden of production, showing that as a matter of law a defendant's conduct caused a legally cognizable injury.

> This part of the causation analysis requires us to consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected. Legal causation is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established. The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct.

*Troxel*, 201 Md. App. at 504 (quoting *Pittway Corp. v. Collins*, 409 Md. 218, 245-46 (2009)). Together, the two burdens establish tort liability.

Additionally, we have noted that "because of the complex nature of medical malpractice cases, expert testimony is normally required to establish breach of the standard of care and causation." *Jacobs v. Flynn*, 131 Md. App. 342, 354 (2000). The Court of Appeals has explained that "[e]xpert witnesses play a pivotal role in medical malpractice actions." *Rodriguez v. Clarke*, 400 Md. 39, 71 (2007). But expert witness testimony is no less important than other evidence presented in the case. *Jacobs*, 131 Md. App. at 355.

Our focus on appeal is whether, based on the entire record, a reasonable jury could have found that Dr. Minkin's negligence was a proximate cause of Ms. Burton's death. *Id.*

Here, as we have discussed, the trial court granted the healthcare providers' motion for JNOV based on what it perceived as insufficient evidence of causation. We, therefore, discuss what type of evidence would be sufficient to prove causation, keeping in mind that our task is to determine whether based on the entire record, could a reasonable juror have found that the Burtons had proven causation. *Id.*

### G. Causation Evidence

The healthcare providers train their sights on Dr. Pushkas. They claim he failed to establish that there was a greater than 50% chance Dr. Minkin's negligence caused Ms. Burton's death. They base their argument on the following portions of Dr. Pushkas' testimony:

- In May 2012, when Ms. Burton complained of a lump in right breast, if she been diagnosed after that examination, it would have revealed she had Stage I-B breast cancer, based on the 1.6-millimeter size of the mass.

- In Dr. Pushkas' opinion, with Stage I-B breast cancer, Ms. Burton had an 80% chance of survival within 5 years, if the cancer had been caught in May 2012.

- When she was finally diagnosed with cancer, in August 2013, Dr. Pushkas opined that Ms. Burton was at Stage III-A.[9]

---

[9] Although, there was a question as to whether she might have been staged at level 3-C based on a later "staging" manual, Dr. Pushkas seemingly agreed that Ms. Burton was at Stage III-A in August 2013.

- A diagnosed triple negative Stage III-A patient like Ms. Burton had a 66% chance of survival over 5 years, Dr. Pushkas opined. "That is correct, yes. That's not differentiating, however, between triple-negative and not triple-negative cancers. **This is all comers**." (emphasis supplied).

That last bullet point is the crux of the controversy and is the heart of the healthcare providers' argument. As was discussed in the previous section, if Ms. Burton had an 80% chance of survival when Dr. Minkin allegedly misdiagnosed her in 2012, but still had a 66% chance of survival even after she was diagnosed in 2013, then the healthcare providers argue the Burtons have not proven it was more likely than not that Dr. Minkin's negligence led to Ms. Burton's death. Put another way, the healthcare providers' view of Dr. Pushkas' testimony is: *Even after she was diagnosed, the probability that a triple negative Stage III-A cancer patient like Ms. Burton would die within 5 years was 34%.* "Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur)." "Mere possibility exists when the evidence is anything less." *Weimer*, 309 Md. at 550; *Pierce*, 296 Md. at 666. Dr. Pushkas established "mere possibility" that the healthcare providers' negligence might have been a cause of Ms. Burton's death.

While Dr. Pushkas' testimony consisted of the points just discussed, after reviewing his testimony we note that Dr. Pushkas also testified to the following:

- If a cancer at Stage I, II, or III spreads, or metastasizes, "the patient will die."

- Patients with Stage III cancers typically have a survival of 50% or less in five years.

- Ms. Burton was also a "triple negative" patient, meaning that she would not respond

as well to various treatments, such as chemotherapy, radiation, or hormonal drugs due to her biological make up.

- With triple negative patients, it is "particularly important that we get to the cancer early before it gets to the point where we cannot control it anymore because our chemotherapy is not that good for triple-negative breast cancer." "So, with any stage, triple-negative has the lowest survival."

- The failure to remove the cancer in May 2012 led to it spreading to Ms. Burton's liver, lungs, and lymph nodes by August 2013, when she went for a follow-up examination and underwent a biopsy.

- Even with her other health problems, diabetes, high-blood pressure, high cholesterol, obesity, but for the metastatic breast cancer, Ms. Burton would have lived to between 70 and 75, although she would not have been in the best of health.

The totality of Dr. Pushkas' testimony provides more than merely conjecture or speculation that had Dr. Minkin performed a biopsy of the lump in Ms. Burton's right breast in May 2012, it would have revealed that she had cancer. The biopsy would have also revealed that she was a triple-negative patient, and thus the usual course of treatment -- chemotherapy, radiation, and hormonal drugs -- would not be as effective for her, especially if the cancer spread to other parts of her body, which it did. It may be logically inferred from that testimony that had the cancer been discovered, Ms. Burton may have survived.

While a review of the cold record of Dr. Pushkas' testimony might seem confusing or worse, contradictory, the jury had the benefit of hearing his testimony in-person and

25

evaluated it. They were free to believe all, part, or none of it. *Edsall v. Huffaker*, 159 Md. App. 337, 342 (2004) ("A jury is not required to accept the testimony of an expert witness."). It is correct that the healthcare providers presented expert testimony that showed Dr. Minkin could not have known that the lump in Ms. Burton's breast was cancerous on May 11, 2012. But when evaluating a motion for JNOV, conflicts in the testimony are resolved in favor of the nonmoving party, in this case, the Burtons. If the jury concluded that Dr. Minkin was correct, and a mammogram and an ultrasound were all that was reasonably required in 2012, then the expert testimony of Drs. Kaufman, Hicks, and Flukinger supported a finding that Dr. Minkin did nothing inappropriate in his care of Ms. Burton.

However, as we must assume the truth of all the Burtons' evidence and any inferences that might be fairly drawn from it in the light most favorable to them, we conclude that the jury could have reasonably found that if Dr. Minkin had caught Ms. Burton's cancer in May 2012, she had an 80% probability of not dying from Stage I cancer. Because he did not intervene early, as he should have, the cancer developed to Stage III, spread to other parts of Ms. Burton's body, and killed her. Dr. Pushkas' testimony and the Burton's other evidence, when viewed with the healthcare providers' opposing evidence, produced the "slight" evidence needed to send the question of the healthcare providers' alleged negligence to the jury. *Barnes*, 210 Md. App. at 480. Consequently, we reverse the circuit court's grant of judgment notwithstanding the verdict and reinstate the jury's award. The jury was tasked with resolving the conflicting expert opinions. It did so here in favor of the Burtons.

26

**THE CIRCUIT COURT FOR BALTIMORE COUNTY'S GRANT OF JUDGMENT NOTWITHSTANDING THE VERDICT IN FAVOR OF APPELLEES IS REVERSED. THE JURY'S VERDICT AND AWARD IS REINSTATED. APPELLEES TO PAY THE COSTS.**